UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────┐
│ USDC SDNY                       │
│ DOCUMENT                        │
│ ELECTRONICALLY FILED            │
│ DOC #:_____          │
│ DATE FILED:___8/28/2024___      │
└─────────────────────────────────┘
```

EFREN GARRIDO, *individually and on behalf of all others similarly situated*,

                                   Plaintiff,

        -v-

F&M CONSTRUCTION AND
DEVELOPMENT CORP. and FODIE M.
KOITA,

                                   Defendants.

No. 21-cv-4084 (MKV)

FINDINGS OF FACT
AND
CONCLUSIONS OF LAW

MARY KAY VYSKOCIL, District Judge:

Plaintiffs are former employees of Defendant F&M Construction and Development Corp. ("F&M"), a construction company, and Defendant Fodie M. Koita, who owns and runs F&M.  In 2021, Plaintiff Efren Garrido filed a complaint against Defendants [ECF No. 1 ("Cmpl.")], alleging wage-and-hour and recordkeeping violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), and the New York Labor Law, §§ 190–199A, 650–665 ("NYLL").  Thereafter, numerous opt-in plaintiffs filed consents to become party plaintiffs [ECF Nos. 5, 6, 7, 8, 9, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 32].

From the outset of the case, the defense failed to comply with its discovery obligations and the Court's orders.  After repeatedly warning defense counsel and Defendants about the potential for sanctions [ECF Nos. 39, 46, 48, 54, 55], the Court issued orders compelling the defense to produce discovery materials [ECF Nos. 55, 58].  The defense still failed to comply fully with the Court's orders, and the Court imposed sanctions [ECF No. 68].

When the Court scheduled a bench trial, the defense failed to submit required pretrial materials in defiance of a court order and the Court's Individual Rules of Practice in Civil Cases

("Individual Rules") [ECF No. 71]. The Court ordered the defense to show cause why it should not be precluded from offering evidence and arguments it had failed to submit in pretrial materials [ECF No. 77]. The defense, however, failed to offer any excuse or reasonable explanation for flouting a court order and the Court's Individual Rules.

As such, in light of the years-long pattern of noncompliance by the defense and the Court's prior imposition of lesser sanctions, the Court ruled that Defendants were precluded from offering certain evidence at the trial [ECF No. 87 ("FPTC Tr.") at 4:24–25]. Moreover, Defendants had failed to reserve the right to cross-examine Plaintiffs' witnesses who had provided their direct testimony by affidavit in accordance with the Court's Individual Rules. FPTC Tr. at 9:9–10. The Court and the parties anticipated that, at the trial, Plaintiffs would call Mr. Koita as an adverse witness, and the defense would have the opportunity to elicit testimony from him on cross-examination. FPTC Tr. at 9:14–21, 11:3–13. The Court explicitly warned the defense at the Final Pretrial Conference that Mr. Koita "need[ed] to be" at the trial and that the defense was close to "defaulting." FPTC Tr. at 12:11–12, 11:25.

The Court commenced a bench trial as scheduled in a court order [ECF Nos. 75, 82 ("Trial Tr.")]. Mr. Koita, however, failed to appear, in contempt of a trial subpoena that Plaintiffs had served [ECF No. 78]. Trial Tr. at 7:7–13. Plaintiffs moved for a default judgment as to Mr. Koita, and defense counsel stated that he had no objection. Trial Tr. at 8:9–15. The Court ruled that Mr. Koita was in default as a sanction for not only his failure to appear at trial in contempt of a trial subpoena, but also Defendants' repeated failures to "produce discovery" and "obey court orders," despite the Court's numerous warnings and two prior rounds of lesser sanctions. Trial Tr. at 8:16–9:1. Although not held in default, F&M did not attempt to challenge Plaintiffs' evidence or offer any evidence in its own defense at the trial.

This Opinion constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Federal Rules of Civil Procedure 52 and 55.

## I.  PROCEDURAL HISTORY

Plaintiff Efren Garrido initiated this action by filing a complaint [ECF No. 1 ("Cmpl.")]. The Complaint, styled as a class and collective action complaint, asserts seven claims: (1) failure to pay overtime in violation of the FLSA, Cmpl. ¶¶ 84–96; (2) failure to pay minimum wages in violation of the FLSA, Cmpl. ¶¶ 97–101; (3) failure to pay overtime in violation of the New York Labor Law ("NYLL"), Cmpl. ¶¶ 102–115; (4) failure to pay minimum wages in violation of the NYLL, Cmpl. ¶¶ 116–121; (5) failure to pay regular wages in violation of the NYLL, Cmpl. ¶¶ 122–125; (6) failure to provide wage notices in violation of the NYLL, Cmpl. ¶¶ 126–129; and (7) failure to provide wage statements in violation of the NYLL, Cmpl. ¶¶ 130–133.

Plaintiff's counsel thereafter filed consent forms on behalf of nineteen opt-in plaintiffs [ECF Nos. 5, 6, 7, 8, 9, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 32]. Almost all of the consents were filed in May and June 2021. The final opt-in consent to become a party plaintiff was filed in September 2021 [ECF No. 32].

After requesting and receiving two extensions of time, Defendants filed an answer [ECF No. 30]. The Court held an Initial Pretrial Conference and entered a Case Management Plan and Scheduling Order [ECF No. 35]. The Court also issued an Order referring the parties to mediation and directing them to participate in good faith [ECF No. 36].

However, approximately four months into the discovery schedule, Plaintiffs' counsel filed two letters advising the Court of Defendants' failures to participate in discovery and in mediation, in defiance of court orders [ECF Nos. 37, 38]. In particular, Plaintiffs' counsel represented that, although the parties were approaching the deadline to complete the discovery, Defendants had "not

served formal responses to Plaintiffs First Request for the Production of Documents, First Set of Interrogatories, or First Request for Admissions, and they ha[d] not served their Rule 26 Initial Disclosures" [ECF No. 37 at 1].  In addition, the court-ordered mediation was "cut short after less than an hour because Defendants indicated" they needed time to obtain important documents before proceeding with the mediation [ECF No. 38 at 2].  The mediator and Plaintiffs rescheduled to accommodate the defense, but, on the eve of the next session, defense counsel stated that the mediation could not proceed because he still did not have the documents [ECF No. 38 at 2].  Furthermore, after prompting by Plaintiffs' counsel, the defense promised to produce document discovery in advance of the court-ordered deadline to complete all fact discovery, but the defense failed to produce the promised documents [ECF No. 38 at 2].

Defendants failed to respond to either of Plaintiffs' letters within the time prescribed by the Court's Individual Rules of Practice in Civil Cases ("Individual Rules").  Thus, "rel[ying] on the uncontested representations of Plaintiffs' counsel," the Court "admonished" Defendants "to work cooperatively with Plaintiffs' counsel to complete the discovery in this case" by an extended deadline [ECF No. 39].  The Court expressly warned "Defense counsel and defendants themselves . . . that failure to comply with court orders and the Court's Individual Rules may result in sanctions, including monetary sanctions and preclusion of defenses" [ECF No. 39].  The Court also specifically directed defense counsel to "inform" Defendants "of this warning" [ECF No. 39].  The Court further ruled that "[i]f Plaintiffs' counsel believes further violations of discovery rules take place after this Order, Plaintiffs have leave to bring on a motion . . . without a conference or further application to the Court" [ECF No. 39].

Two weeks later, Plaintiffs filed a motion to compel [ECF Nos. 40, 41 ("Pl. Mot."), 42].  Plaintiffs' counsel represented that, after the Court's order, the defense had still "failed to serve[:]

their (i) Initial Disclosures pursuant to Rule 26; (ii) Responses to Plaintiffs' First Request for the Production of Documents; (iii) Responses to Plaintiffs' First Set of Interrogatories; (iv) Responses to Plaintiffs' First Request for Admissions; and (v) documents responsive to Plaintiffs' requests." Pl. Mot. at 4. Plaintiffs' counsel further represented that "Defendants' counsel did not bother to appear" at another scheduled mediation session. Pl. Mot. at 4.

Defendants failed to respond to Plaintiffs' motion to compel. Thus, in an Order To Show Cause, the Court directed the defense to explain why defense counsel and Defendants should not be sanctioned [ECF No. 46]. The Court again warned that failure to comply with court orders and applicable rules could result in sanctions [ECF No. 46]. The Court directed defense counsel to "inform Defendants of this second warning" [ECF No. 46].

In response to the Order To Show Cause, defense counsel filed a letter stating that he had discussed with Defendants the need to produce discovery and "the repeated warnings from the Court," but Defendants "were having trouble locating the [relevant] records" [ECF No. 47 at 2]. Defense counsel requested a "14-day extension to comply with the outstanding discovery" [ECF No. 47 at 2]. Defense counsel specifically represented that he would "complete the responses to Plaintiff's demands, deliver any records" Defendants were able to locate, and submit an "affidavit for any documents that they [were] unable to recover" [ECF No. 47 at 2].

The Court granted the defense "14 days to produce all outstanding discovery" [ECF No. 48]. The Court again warned: "Defense counsel and Defendants remain on notice that failure to comply with court orders and discovery rules may result in sanctions" [ECF No. 48].

The defense then requested a further extension of time to comply, which the Court granted [ECF Nos. 49, 50]. The defense, however, failed to produce "any" of the promised discovery by the further-extended deadline [ECF Nos. 51, 54].

The Court scheduled a conference in an effort to move the case forward [ECF No. 54].  In scheduling order, the Court again warned that "[d]efense counsel and Defendants will face sanctions, including monetary sanctions and preclusion of defenses and evidence, because of their repeated failures to heed the Court's order[s] and warnings" [ECF No. 54].  The Court instructed defense counsel to file, one week in advance of the conference, an affidavit representing that he had informed Defendants that they were facing sanctions, as well as "any written submission in response" to Plaintiffs' representation that the defense had "not taken any action to cure their discovery violations" in defiance of the Court's previous Orders [ECF No. 54 (internal quotation marks omitted)].

The defense failed to file anything by the pre-conference deadline.  The Court then issued an Order granting Plaintiffs' earlier-filed motion to compel and another Order To Show Cause [ECF No. 55].  Defense counsel filed a response stating that he had repeatedly "warned Mr. Koita" about the risk of sanctions [ECF No. 56 at 1].  He also promised to file an "an affirmation regarding [his] office's discussions with defendant regarding the outstanding discovery and [the Court's] warnings" and "an affidavit [from Mr. Koita] regarding his efforts to locate documents" by the date of the scheduled conference [ECF No. 56 at 2].

The Court held the conference.  The defense did not file the promised affirmation and affidavit in advance of the conference, or bring those documents to the conference, or take any steps to cure its discovery violations in advance of the conference.  At the conference, defense counsel represented to the Court that he would produce all outstanding discovery by the close of business that day [ECF No. 68].

As such, the Court ruled that "by 5:00 p.m.," "Defendants shall produce Rule 26 Initial Disclosures, formal written responses to all outstanding discovery demands, and an affidavit from

Defendants detailing: their efforts to locate responsive documents, what materials have been located and produced, and the document requests for which Defendants were unable to locate responsive documents" [ECF No. 58].  The further Court ruled: "This is the Court's final warning to defense counsel and Defendants.  If they fail to comply with this Order and cure their discovery violations, the Court will impose sanctions in the amount of $200 every day the required materials are not produced.  The defense will be precluded from offering at trial any documents that they fail to produce by 5:00 p.m. today" [ECF No. 58].

Defendants failed to produce any materials by 5:00 p.m. that day.  Instead, Defendants produced materials between 8:17 p.m. the day of the conference and 12:06 a.m. the next morning [ECF Nos. 59–65, 66, 67].  Plaintiffs requested that Defendants be precluded from offering any of the materials, since everything was produced after the deadline [ECF No. 66].  Defendants opposed that request [ECF No. 67].  The Court ruled that Defendants would be permitted to offer at trial the materials produced by 12:06 a.m. the morning after the conference [ECF No. 68].  However, Defendants were "precluded from offering any discovery that was not produced" by that time [ECF No. 68 at 1].  The Court also "sanction[ed] the defense in the amount of Plaintiff[s'] costs in bringing on the motion to compel production of the discovery" [ECF No. 68 at 1–2].  In the same order, the Court set a deadline for the parties to file a joint status letter to continue to move the case forward [ECF No. 68 at 2].

The parties, however, failed to file the joint status letter and allowed the case to languish until the Court issued an Order To Show Cause directed at both sides [ECF No. 69].  The Court ordered Plaintiffs to explain why the case should not be dismissed for failure to prosecute and ordered both sides to explain why they should not be sanctioned [ECF No. 69].  Plaintiffs filed a letter on behalf of both sides requesting a trial date [ECF No. 70].

The Court scheduled a trial and set a deadline for the parties to submit the pretrial materials required by the Court's Individual Rules [ECF No. 71], including a proposed Joint Pretrial Order, witness lists, trial exhibits, "proposed findings of fact and conclusions of law," and "affidavits constituting the direct testimony of each trial witness, except for the direct testimony of an adverse party," Individual Rules 7(A)–(C). The Court's Individual Rules also set deadlines for parties to "submit a list of all affiants whom he or she intends to cross-examine at the trial" and to oppose "any legal argument" submitted by the other side. Individual Rules 7(C)(i), 7(D)(iii).

Plaintiffs timely submitted their required materials, including a detailed affidavit from each plaintiff who remains in the case testifying to his recollection of his hours and wages [ECF No. 73]. Plaintiffs also timely submitted a proposed Joint Pretrial Order, signed by defense counsel, and Plaintiffs' proposed findings of fact and conclusions of law [ECF Nos. 72, 73].

Defendants failed to file any pretrial materials either in support of their case in chief or in response to Plaintiffs' submissions. Specifically, Defendants, yet again, flouted a court order and the Courts' Individual Rules by failing to file witness affidavits or exhibits, even though defense counsel signed a proposed Joint Pretrial Order indicating that Defendants wished to offer testimony and documentary evidence [ECF No. 72 at 4]. Defendants also failed to "submit a list" indicating that they intended to cross-examine any of the plaintiffs on the direct testimony in their affidavits. Individual Rule 7(C)(i). Moreover, Defendants failed to file their own proposed findings of fact and conclusions of law and failed to file any opposition to the arguments in Plaintiffs' submission. See Individual Rule 7(D)(iii).

The Court issued an Order To Show Cause instructing Defendants to "show cause" at the Final Pretrial Conference "why the Court should not preclude Defendants from presenting at the trial evidence, exhibits, and arguments that were not timely submitted" [ECF No. 77]. The Court

warned that "given Defendants' past pattern of failing to comply with the Court's orders and Rules, the Court is inclined to impose sanctions" [ECF No. 77].

When asked at the Final Pretrial Conference why the defense had failed to submit required pretrial materials, defense counsel offered no justification [ECF No. 87 ("FPTC Tr.") at 4]. He merely stated, "We dropped the ball." FPTC Tr. at 4:21. He said he had thought the case might settle. FPTC Tr. at 4:4.

The Court ruled that the defense was precluded from offering direct testimony as a sanction for failing to comply with a court order and the Court's Individual Rules with respect to pretrial materials. FPTC Tr. at 4:24–5:4. The Court explained that Defendants were "supposed to have submitted affidavits, as the plaintiff did, memorializing any direct testimony." FPTC Tr. at 5:2–3. As noted above, Defendants failed to submit such affidavits. The Court explained that it was sanctioning the defense in light of Defendants' ongoing "pattern of noncompliance," which had persisted after the Court "previously issue[d] a sanction." FPTC Tr. at 4:6–14.

The Court further observed that the defense had failed to reserve its right to cross-examine Plaintiffs' witnesses who had provided their direct testimony by affidavit in accordance with the Court's Individual Rules. FPTC Tr. at 9:9–10; *see* FPTC Tr. at 8:9–9:10. There was also "no evidence designated by the defense." FPTC Tr. at 10:6–7. In that regard, defense counsel noted that Mr. Koita had "been very reluctant to provide any of the documentary evidence" he had been "asked for," so, defense counsel represented, Defendants intended to rely on "verbal evidence that could support a defense." FPTC Tr. at 5:16–18.

The Court and the parties therefore anticipated that, at the trial, Plaintiffs would call Mr. Koita as an adverse witness, and the defense would have the opportunity to elicit testimony from him on cross-examination. FPTC Tr. at 11:3–13; *see* FPTC Tr. at 9:14–21. At the Final Pretrial

Conference, Plaintiffs' counsel stressed that Mr. Koita was "currently under subpoena." FPTC Tr. at 9:15–16. Defense counsel promised that Mr. Koita would appear. *See* FPTC Tr. at 9:19 ("He'll be showing up."); FPTC Tr. at 12:14 ("I will make sure he's here, your Honor.").

The Court explicitly warned the defense at the Final Pretrial Conference that Mr. Koita "need[ed] to be" at the trial and that the defense was close to "defaulting." FPTC Tr. at 12:11–12, 11:25. The Court specifically noted that it had "nothing from the defense with respect to damages." FPTC Tr. at 12:17–18. As such, the Court stated that Plaintiffs' detailed affidavits would constitute "the record" on damages, "unless" Mr. Koita's testimony "undermines what's been submitted." FPTC Tr. at 12:18–20.

The Court commenced a bench trial, as scheduled [ECF No. 75], at which counsel for both sides appeared. Trial Tr. at 7:7–13. At the trial, Plaintiffs offered, and the Court admitted without objection from the defense, the affidavits of Plaintiff Efren Garrido and Opt-In Plaintiffs David Alcoser, Ivan Naula, Osmin Marquez, Yovany Mura, Freddy Pachar, Hernan Sisalima, Carlos Carrillo, Jesus Samir Garcia, Andres Lima, Jorge Salto, Santos Melgar, Daniel Santana Jimenez, Luis Lazcano, Manuel Benabides, Alexander Chumil, Santos Donastorg, and Peter Rijo. Trial Tr. at 5–6 [ECF Nos. 84-3 ("Garrido Aff."), 84-4 ("Alcoser Aff."), 84-5 ("Naula Aff."), 84-6 ("Marquez Aff."), 84-7 ("Mura Aff."), 84-8 ("Pachar Aff."), 84-9 ("Sisalima Aff."), 84-10 ("Carrillo Aff."), 84-11 ("Garcia Aff."), 84-12 ("Lima Aff."), 84-13 ("Salto Aff."), 84-14 ("Melgar Aff."), 84-15 ("Jiminez Aff."), 84-16 ("Lazcano Aff."), 84-17 ("Benabides Aff."), 84-18 ("Chumil Aff."), 84-19 ("Donastorg Aff."), 84-20 ("Rijo Aff.")].[1] These affidavits contained Plaintiffs' recollections of the hours they worked and wages they received, among other details about their employment. As noted above, Defendants had failed to reserve the right to cross-examine any of

---

[1] Plaintiffs voluntarily dismissed the claims of Opt-In Plaintiffs Milton Pevas and Wilmer Quinonez [ECF No. 81], as Plaintiffs had indicated was their intention at the Final Pretrial Conference, FPTC Tr. at 7:18–23.

the plaintiffs on the direct testimony provided in their affidavits, and, therefore, none was called to the stand as a live witness.

Plaintiffs' counsel then stated that he "would be ready to call [his] first witness," Mr. Koita, but "[t]he defendant is not here."  Trial Tr. at 6:19–20.  Plaintiffs' counsel explained that Plaintiffs had intended to rely on Mr. Koita's testimony to establish his "individual liability and," as owner and operator of F&M, "the corporate background of F&M Construction."  Trial Tr. at 7:23–8:3. Both sides confirmed that Mr. Koita had failed to appear in contempt of a trial subpoena [ECF No. 78].  *See* Trial Tr. at 7:11–12, 8: 11–12.  At that point, defense counsel volunteered that he was "going to rest," even though Plaintiffs had yet to rest.  Trial Tr. at 7:16.

Plaintiffs then moved for a default judgment against Mr. Koita as a sanction for his nonappearance and contempt of a trial subpoena.  Trial Tr. at 8:9–12.  Plaintiffs asked the Court to rule that Mr. Koita was in default and, therefore, to deem admitted the allegations in the Complaint pertinent to his individual liability, as well as allegations about F&M within Mr. Koita's knowledge.  Trial Tr. at 8:6–8:8.  Defense counsel stated that he had no objection to entry of a default judgment against Mr. Koita.  Trial Tr. at 8:14–15 ("At this point my hands are tied . . . . I don't have an objection.").  Plaintiffs also offered Mr. Koita's deposition transcript [ECF No. 86 ("Koita Depo.")], which the Court admitted, without objection from the defense, noting that Mr. Koita had made himself unavailable. Trial Tr. at 11:12–20; *see* Fed. R. Evid. 804.

The Court ruled that Mr. Koita was in default as a sanction for not only Mr. Koita's failure to appear at trial, in contempt of a subpoena, but also his repeated failures to "produce discovery" and "obey court orders," despite the Court's repeated warnings and two prior rounds of lesser sanctions.  *See* Trial Tr. at 8:16–9:1.  Thereafter, Plaintiffs rested, and defense counsel, having already agreed that Mr. Koita was in default, confirmed that he was not putting on "any case" in

defense of F&M. Trial Tr. at 9:5–9. As such, the Court stated, Mr. Koita "is in default, so he is going to be found liable," and "with respect to the corporation, I have the plaintiffs' evidence." Trial Tr. at 10:4–6. The Court directed the parties to submit post-trial briefs, which both sides filed [ECF Nos. 84 ("Pl. PTB"), 85 ("Def. PTB"), 86].

In Plaintiffs' Post-Trial Brief, Plaintiffs request relief on all their claims against Defendants F&M and Mr. Koita, "seeking, as applicable, unpaid overtime, unpaid regular wages, liquidated damages, recordkeeping penalties, pre- and post-judgment interest, and attorneys' fees and costs." Pl. PTB at 3. Plaintiffs point out that "there are no time records or payroll records in evidence" because Defendants failed to produce such records in response to Plaintiffs' discovery demands, even after the Court's order compelling Defendants to produce all outstanding discovery. Pl. PTB at 2. As such, "Plaintiffs rely on their personal recollection[s]," set forth in the affidavits the Court admitted at trial, to establish "their time worked each week and the amounts they were paid." Pl. PTB at 2. Plaintiffs also rely on Mr. Koita's deposition, which the Court also admitted at the trial, to establish Defendants' liability. Pl. PTB at 2.[2]

 In Defendants' Post-Trial Brief, the defense fails to make separate arguments about the two separate defendants, F&M and Mr. Koita. The defense further fails to challenge any element of either defendant's liability. Instead, the defense concedes that a default judgment on all liability is appropriate based on the "failure to defend." Def. PTB at 9. The defense further concedes that Defendants had the burden to make, keep, and provide work records, which Defendants failed to

---

[2] Notwithstanding that Plaintiffs obtained a default judgment against Mr. Koita, they need not rely on any unadmitted allegation in the Complaint for any fact in this case. In only one instance in the Post-Trial Brief, Plaintiffs cite only to an allegation in the Complaint for a proposed finding of fact. Specifically, Plaintiffs cite their Complaint for the proposition that F&M is a New York corporation. Pl. PTB at 3 & n.6. The Court notes, however, that Defendants "admit[]" in their Answer "that F&M Construction is a New York domestic corporation" [ECF No. 30 ("Answer") ¶ 6]. Moreover, at his deposition, Mr. Koita testified to the "New York, New York . . . . corporate address" of F&M. Koita Depo. at 16:10–12. Mr. Koita also confirmed that the proposition that F&M is a New York corporation is information within his knowledge, since he testified that he is "the individual who formed F&M" and stated, "It's my company." Koita Depo. at 15:25–16:3, 15:14.

ever produce, and, as such, Plaintiffs are entitled to rely on their recollections. Def. PTB at 4–5. However, the defense requests an inquest on damages, asserting for the first time that Plaintiffs' affidavits are "vague." Def. PTB at 9, 10.

## II. FINDINGS OF FACT

The Court makes the following findings of fact based on Plaintiffs' unchallenged evidence at the bench trial, including Plaintiffs' affidavits and Mr. Koita's Deposition. As stated below, and as Defendants acknowledge, *see* Def. PTB at 4, where, as here, an employer fails to maintain and produce accurate and adequate employment records, plaintiffs have a "lenient burden of proof," and a court may award "approximate" damages, relying on "estimates based on [plaintiffs'] own recollection[s]," *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 362 (2d Cir. 2011); *see Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 688 (1946). Contrary to Defendants' meritless assertion, raised for the first time in their Post-Trial Brief, Plaintiffs' affidavits are sufficiently detailed and precise for the Court to make factual findings that support damages.

The Court notes that Mr. Koita's "default is an admission of all well-pleaded allegations against" him, *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004), but the Court does not rely on allegations in the Complaint alone for any of its factual findings. Indeed, as noted above, Plaintiffs cite the Complaint for only a single proposed finding of fact in their Post-Trial Brief, and Defendants expressly admit that fact in their Answer. *See* Pl. PTB at 3 & n.6; Answer ¶ 6. Defendants, including F&M, which is not in default, have simply failed to challenge any aspect of Plaintiffs' evidence or to offer any evidence of their own. Even in their Post-Trial Brief, they do not contest any element of their liability

### A. Defendants

Fodie Koita was the owner and president of F&M Construction and Development Corp.,

which was a New York construction company.  *See* Answer ¶ 6; Koita Depo. at 15:8–19:7.

F&M was an enterprise engaged in commerce or in the production of goods for commerce pursuant to the FLSA, 29 U.S.C. Section 203(s), and its gross annual volume of sales made or business done was not less than $500,000.00 in 2020 [ECF No. 72 ("JPTO") ¶ 9].

F&M did construction jobs, including "masonry" and "stucco," on commercial properties. Koita Depo. at 22:11–22.  F&M did a job on the upper east side of Manhattan for a number of months in 2020.  *See* Koita Depo. at 24:5–14, 26:3–4; *cf.* Garrido Aff. ¶ 5; Alcoser Aff. ¶ 6; Naula Aff. ¶ 6; Marquez Aff. ¶ 6; Mura Aff. ¶ 6; Pachar Aff. ¶ 6; Sisalima Aff. ¶ 6; Carrillo Aff. ¶ 6; Garcia Aff. ¶ 6; Lima Aff. ¶ 6; Salto Aff. ¶ 6; Melgar Aff. ¶ 6; Jiminez Aff. ¶ 6; Lazcano Aff. ¶ 6; Benabides Aff. ¶ 6; Chumil Aff. ¶ 6; Donastorg Aff. ¶ 6; Rijo Aff. ¶ 6.

F&M employed Plaintiffs as manual laborers.  *See* Garrido Aff. ¶ 3; Alcoser Aff. ¶ 4; Naula Aff. ¶ 4; Marquez Aff. ¶ 4; Mura Aff. ¶ 4; Pachar Aff. ¶ 4; Sisalima Aff. ¶ 4; Carrillo Aff. ¶ 4; Garcia Aff. ¶ 4; Lima Aff. ¶ 4; Salto Aff. ¶ 4; Melgar Aff. ¶ 4; Jiminez Aff. ¶ 4; Lazcano Aff. ¶ 4; Benabides Aff. ¶ 4; Chumil Aff. ¶ 4; Donastorg Aff. ¶ 4; Rijo Aff. ¶ 4.

Mr. Koita had the authority to hire and fire employees.  Koita Depo. at 27:6–9.  He also had the authority to determine employees' hours and pay.  Koita Depo. at 28:23–25, 29:22–23.  It was Mr. Koita's responsibility to maintain records of the time employees worked.  Koita Depo. at 29:2–4.  It was also Mr. Koita's responsibility to make sure employees were paid properly.  Koita Depo. at 31:22–25.

At his deposition, Mr. Koita did not recall taking any steps to make sure that F&M was in compliance with the FLSA and the NYLL.  Koita Depo. at 66:9–13.  He "did not" do any research into the requirements of the FLSA and the NYLL to determine what obligations F&M had with regard to paying its employees.  Koita Depo. at 63:13–18.  He did not know whether employees

who work more than 40 hours in a week are entitled to overtime pay.  Koita Depo. at 65:2–5.  He also "did not know" that "manual laborers are required to be paid within seven days of the end of the pay period."  Koita Depo. at 84:21–24.

### B. Plaintiffs

#### 1. Garrido

Efren Garrido, the plaintiff who filed the Complaint in March 2021 [ECF No. 1], was employed by Defendants "from on or about August 12, 2020 until on or about October 6, 2020."  Garrido Aff. ¶¶ 1, 5.  He was a "manual laborer" who installed stucco.  Garrido Aff. ¶¶ 3, 4.  His regular rate of pay was $40.00 per hour.  Garrido Aff. ¶ 13.

During his first week of employment, Garrido worked 33 hours.  *See* Garrido Aff. ¶ 7.  He worked Wednesday from 7:00 a.m. to 3:30 p.m., Thursday from 7:00 a.m. to 4:30 p.m., Friday from 7:00 a.m. to 5:00 p.m., and Saturday from 9:00 a.m. to 4:00 p.m.  Garrido Aff. ¶ 6.  He took a thirty-minute meal break each shift.  Garrido Aff. ¶ 6.

From then on, each week for approximately seven weeks, Garrido worked Monday through Wednesday from 7:00 a.m. to 3:30 p.m., Thursday from 7:00 a.m. to 4:30 p.m., and Friday from 7:00 a.m. to 5:00 p.m.  Garrido Aff. ¶ 8.  He also worked several Saturdays from 9:00 a.m. to 4:00 p.m., including August 22, 2020, September 19, 2020, and September 26, 2020.  Garrido Aff. ¶ 9.  He always took a thirty-minute meal break.  *See* Garrido Aff. ¶¶ 8, 9.  During the weeks he worked on Saturdays, he worked 49 hours.  Garrido Aff. ¶ 10.  He otherwise worked 42.5 hours each week.  Garrido Aff. ¶ 11.

During his final week of employment, Garrido worked 16 hours.  Garrido Aff. ¶ 12.  He worked Monday and Tuesday from 7:00 a.m. to 3:30 p.m. with a thirty-minute meal break each

shift.  Garrido Aff. ¶ 12.

Garrido "received a single paycheck during [his] employment in the amount of $1,150.00 on or about September 1, 20202."  Garrido Aff. ¶ 14.  That paycheck was for Garrido's first week of work.  Garrido Aff. ¶ 14.  He "was only paid for 28.75 hours," even though he had worked 33 hours that week.  Garrido Aff. ¶ 14; *see* Garrido Aff. ¶ 7.

Garrido was "never given a wage notice in [his] primary language" and "was never given paystubs that included [his] rate of pay, hours worked, or any other information."  Garrido Aff. ¶¶ 18, 19.

### 2.  Alcoser

David Alcoser opted-in as a plaintiff in May 2021 [ECF Nos. 8, 84-2].  He was employed by Defendants "from on or about June 28, 2020 until on or about October 10, 2020."  Alcoser Aff. ¶¶ 1, 6.  He was a "manual laborer" who installed "bricks, blocks, and other [masonry] materials."  Alcoser Aff. ¶ 5.  His regular rate of pay was $32.00 per hour.  Alcoser Aff. ¶ 11.

From on or about June 28, 2020 until on or about September 12, 2020, Alcoser worked "Monday through Friday from 7:00 a.m. to 5:00 p.m. and Saturdays from 9:00 a.m. to 4:00 p.m. with a thirty-minute meal break each shift."  Alcoser Aff. ¶ 7.  During this time, Alcoser worked 54 hours per week.  Alcoser Aff. ¶ 8.

From on or about September 12, 2020 until on or about October 10, 2020, Alcoser worked Monday through Friday from 7:00 a.m. to 3:30 p.m., with a thirty-minute meal break each day.  Alcoser Aff. ¶ 9.  During this time, he worked 40 hours per week.  Alcoser Aff. ¶ 10.

Alcoser "was paid straight-time," meaning his regular rate of pay, "for all the [compensated] hours that [he] worked."  Alcoser Aff. ¶ 12.  He "was never paid the overtime premium" when he worked more than 40 hours in a week.  Alcoser Aff. ¶ 13.  Moreover, Alcoser

"was not paid anything at all for the final three (3) weeks of [his] employment, from September 20, 20202 through October 10, 2020."  Alcoser Aff. ¶ 14.

Alcoser was "never given a wage notice in [his] primary language" and "was never given paystubs that included [his] rate of pay, hours worked, or any other information."  Alcoser Aff. ¶¶ 15, 16.

### 3.  Naula

Ivan Naula opted-in as a plaintiff in May 2021 [ECF Nos. 23, 84-2].  He was employed by Defendants from on or about October 13, 2019 until on or about October 10, 2020.  Naula Aff. ¶¶ 1, 6.  He was a "manual laborer" whose duties included "counting materials and cementing blocks and bricks."  Naula Aff. ¶¶ 4, 5.  His regular rate of pay was $34.00 per hour.  Naula Aff. ¶ 11.

Throughout his employment, Naula worked "Monday through Friday from 7:00 a.m. to 3:30 p.m. with a thirty-minute meal break."  Naula Aff. ¶ 7.  He also "worked two (2) Saturdays a month from 7:00 a.m. to 3:00 p.m. with a thirty-minute meal break."  Naula Aff. ¶ 8.  During the weeks that Naula worked on Saturday, he worked 47.5 hours.  Naula Aff. ¶ 9.  He otherwise worked 40 hours per week.  Naula Aff. ¶ 10.

Naula "was paid straight-time for all the [compensated] hours that [he] worked."  Naula Aff. ¶ 12.  He was "never paid the overtime premium" when he worked more than 40 hours in a week.  Naula Aff. ¶ 16.  He also was "not paid for all of [his] hours" the week of August 2, 2020.  Naula Aff. ¶¶ 13, 14.  That week, he was paid $884.00, "which was for only 26 hours of work, even though [he] worked at least 40 hours."  Naula Aff. ¶ 14.  Furthermore, Naula "was not paid anything at all for the final two (2) weeks of [his] employment, from September 27, 2020 through October 10, 2020."  Naula Aff. ¶ 17.

Naula was "never given a wage notice in [his] primary language" and "was never given

paystubs that included [his] rate of pay, hours worked, or any other information." Naula Aff. ¶¶ 18, 19.

### 4. Marquez

Osmin Marquez opted-in as a plaintiff in May 2021 [ECF Nos. 16, 84-2]. He was employed by Defendants from on or about May 3, 2020 until on or about October 10, 2020. Marquez Aff. ¶¶ 1, 6. He was a "manual laborer" who installed stucco and insulation. Marquez Aff. ¶¶ 4, 5. His regular rate of pay was $27.50 per hour. Marquez Aff. ¶ 11.

Throughout his employment, Marquez worked Monday through Wednesday from 7:00 a.m. to 3:30 p.m., Thursday from 7:00 a.m. to 4:30 p.m., and Friday from 7:00 a.m. to 5:00 p.m. Marquez Aff. ¶ 7. He also worked one Saturday per month from 9:00 a.m. to 4:00 p.m. Marquez Aff. ¶ 8. He took a thirty-minute meal break each shift. Marquez Aff. ¶¶ 7, 8. During the weeks that Marquez worked on Saturday, he worked 49 hours. Marquez Aff. ¶ 9. He otherwise worked 42.5 hours. Marquez Aff. ¶ 10.

Marquez "was paid straight-time" for all of the compensated hours he worked. Marquez Aff. ¶ 12. He was "never paid the overtime premium," even though he worked more than 40 hours each week. Marquez Aff. ¶ 19.

Some weeks, Marquez was not paid anything for hours that he worked. Marquez Aff. ¶ 13. In particular, for the week of August 2, 2020, he was paid $880.00, "which was for only 32 hours of work, even though [he] worked at least 42.5 hours." Marquez Aff. ¶ 14. For the week of August 9, 2020, he was paid $1,039.00, "which was for only 37.75 hours of work, even though [he] worked at least 42.5 hours." Marquez Aff. ¶ 17. For the week of August 16, 2020, he paid $908.00, "which was for only 33 hours of work, even though [he] worked at least 42.5 hours." Marquez Aff. ¶ 16. For the week of September 13, 2020, he was paid $1,100.00, "which was for

only 40 hours of work, even though [he] worked at least 42.5 hours." Marquez Aff. ¶ 18. Marquez "was not paid anything at all for the final three (3) weeks of [his] employment, from September 20, 2020 through October 10, 2020." Marquez Aff. ¶ 20.

Marquez was "never given a wage notice in [his] primary language" and "was never given paystubs that included [his] rate of pay, hours worked, or any other information." Marquez Aff. ¶¶ 21, 22.

### 5. Mura

Yovany Mura opted-in as a plaintiff in May 2021 [ECF Nos. 18, 84-2]. He was employed by Defendants from on or about October 13, 2019 until on or about October 10, 2020. Mura Aff. ¶¶ 1, 6. He was a "manual laborer" who installed stucco. Mura Aff. ¶¶ 4, 5. His regular rate of pay was $25.00 per hour. Mura Aff. ¶ 11.

Throughout his employment, Mura worked Monday through Friday from 7:00 a.m. to 3:30 p.m. with a thirty-minute meal break. Mura Aff. ¶ 7. He also worked two Saturdays per month from 9:00 a.m. to 4:00 p.m. with a thirty-minute meal break. Mura Aff. ¶ 8. During the weeks that Mura worked on Saturday, he worked 46.5 hours. Mura Aff. ¶ 9. He otherwise worked 40 hours. Mura Aff. ¶ 10.

Mura "was paid straight-time" for the compensated hours he worked. Mura Aff. ¶ 12. He was "never paid the overtime premium" when he worked more than 40 hours in a week. Mura Aff. ¶ 16. He also was "not paid for all of [his] hours" the week of August 2, 2020. Mura Aff. ¶¶ 13, 14. That week, he was paid $800.00, "which was for only 32 hours of work, even though [he] worked at least 40 hours." Mura Aff. ¶ 14. Furthermore, Mura "was not paid anything at all for

the final three (3) weeks of [his] employment, from September 20, 2020 through October 10, 2020." Mura Aff. ¶ 17.

Mura was "never given a wage notice in [his] primary language" and "was never given paystubs that included [his] rate of pay, hours worked, or any other information." Mura Aff. ¶¶ 18, 19.

### 6. Pachar

Freddy Pachar opted-in as a plaintiff on May 27, 2021 [ECF Nos. 22, 84-2].[3]  He was employed by Defendants from on or about May 5, 2019 until on or about October 10, 2020.  Pachar Aff. ¶¶ 1, 6.  He was a "manual laborer" who installed stucco.  Pachar Aff. ¶¶ 4, 5.  His regular rate of pay was $27.50 per hour.  Pachar Aff. ¶ 11.

Throughout his employment, Pachar worked Monday through Wednesday from 7:00 a.m. to 3:30 p.m., Thursday from 7:00 a.m. to 4:30 p.m., and Friday from 7:00 a.m. to 5:00 p.m.  Pachar Aff. ¶ 7.  He took a thirty-minute meal break each shift.  Pachar Aff. ¶ 7.  He also worked two Saturdays from 9:00 a.m. to 4:00 p.m. with a thirty-minute meal break.  Pachar Aff. ¶ 8.  During the weeks that Pachar worked on Saturday, he worked 49 hours.  Pachar Aff. ¶ 9.  He otherwise worked 42.5 hours.  Pachar Aff. ¶ 10.

Pachar "was paid straight-time" for the compensated hours he worked.  Pachard Aff. ¶ 12. He was "never paid the overtime premium," even though he worked more than 40 hours each week.  Pachar Aff. ¶ 19.  For the week of August 16, 2020, he was paid $1,368.00, "which was straight-time for the 49.75 [he] worked that week."  Pachar Aff. ¶ 17.

Some weeks, Pachar was not paid anything for hours that he worked.  Pachar Aff. ¶ 13. For the week of August 2, 2020, he was paid $880.00, "which was for only 32 hours of work, even

---

[3] The Court provides the exact date of the filing of the consent to be a party plaintiff where, as here, it is relevant to a later discussion about the FLSA statute of limitations.

though [he] worked at least 42.5 hours." Pachar Aff. ¶ 14. For the week of August 9, 2020, he was paid $1,100.00, "which was for only 40 hours of work, even though [he] worked at least 42.5 hours." Pachar Aff. ¶ 16. Likewise, for the week of August 23, 2020, he was paid $1,100.00 for 40 hours of work, even though he worked 42.5 hours. Pachar Aff. ¶ 18. Furthermore, Pachar "was not paid anything at all for the final three (3) weeks of [his] employment, from September 20, 2020 through October 10, 2020." Pachar Aff. ¶ 20.

Pachar was "never given a wage notice in [his] primary language" and "was never given paystubs that included [his] rate of pay, hours worked, or any other information." Pachar Aff. ¶¶ 21, 22.

### 7. Sisalima

Hernan Sisalima opted-in as a plaintiff on June 3, 2021 [ECF Nos. 24, 84-2]. He was employed by Defendants from on or about May 5, 2019 until on or about October 10, 2020. Sisalima Aff. ¶¶ 1, 6. He was a "manual laborer" who installed stucco. Sisalima Aff. ¶¶ 4, 5. His regular rate of pay was $27.50 per hour. Sisalima Aff. ¶ 11.

Throughout his employment, Sisalima worked Monday through Wednesday from 7:00 a.m. to 3:30 p.m., Thursday from 7:00 a.m. to 4:30 p.m., and Friday from 7:00 a.m. to 5:00 p.m. Sisalima Aff. ¶ 7. He took a thirty-minute meal break each shift. Sisalima Aff. ¶ 7. He also worked two Saturdays each month from 9:00 a.m. to 4:00 p.m. with a thirty-minute meal break. Sisalima Aff. ¶ 8. During the weeks that Sisalima worked on Saturday, he worked 49 hours. Sisalima Aff. ¶ 9. He otherwise worked 42.5 hours. Sisalima Aff. ¶ 10.

Sisalima "was paid straight-time" for the compensated hours he worked. Sisalima Aff. ¶ 12. He was "never paid the overtime premium," even though he worked more than 40 hours each week. Sisalima Aff. ¶ 20. In particular, for the weeks of July 26, 2020 and August 16, 2020,

Sisalima was paid $1,368.00, "which was straight-time for the 49.75 hours [he] worked" those weeks.  Sisalima Aff. ¶¶ 17, 18.

Some weeks, Sisalima was not paid for hours that he worked.  Sisalima Aff. ¶ 13.  For the week of August 2, 2020, he was paid $880.00, "which was for only 32 hours of work, even though [he] worked at least 42.5 hours."  Sisalima Aff. ¶ 14.  For the week of August 9, 2020, he was paid $1,100.00, "which was for only 40 hours of work, even though [he] worked at least 42.5 hours."  Sisalima Aff. ¶ 16.  Likewise, for the week of August 23, 2020, he was paid $1,100.00 for 40 hours of work, even though he worked 42.5 hours.  Sisalima Aff. ¶ 19.  Furthermore, Sisalima "was not paid anything at all for the final three (3) weeks of [his] employment, from September 20, 2020 through October 10, 2020."  Sisalima Aff. ¶ 21.

Sisalima was "never given a wage notice in [his] primary language" and "was never given paystubs that included [his] rate of pay, hours worked, or any other information."  Sisalima Aff. ¶¶ 22, 23.

### 8.  Carillo

Carlos Carillo opted-in as a plaintiff in May 2021 [ECF Nos. 14, 84-2].  He was employed by Defendants from on or about April 19, 2020 until on or about November 7, 2020.  Carillo Aff. ¶¶ 1, 6.  He was a "manual laborer" who installed stucco.  Carillo Aff. ¶¶ 4, 5.  His regular rate of pay was $35.00 per hour.  Carillo Aff. ¶ 9.

Throughout his employment, Carillo worked Monday through Friday from 7:00 a.m. to 4:00 p.m. with a thirty-minute meal break each shift.  Carillo Aff. ¶ 7.  He worked 42.5 hours each week.  Carillo Aff. ¶ 8.

Carillo "was only paid for . . . up to forty (40) [hours] per week."  Carillo Aff. ¶ 10.  And

he "was never paid overtime." Carillo Aff. ¶ 16.

Moreover, "there were also times that [Carillo] was not paid for some of the hours [he] worked below forty (40)." Carillo Aff. ¶ 11. For the week of August 2, 2020, he was paid $1,120.00, "which was for only 32 hours of work, even though [he] worked at least 42.5 hours." Carillo Aff. ¶ 12. For the week of August 16, 2020, he was paid $1,330.00, "which was for only 38 hours of work, even though [he] worked at least 42.5 hours." Carillo Aff. ¶ 13. For the week of September 13, 2020, he was paid $1,120.00 for 32 hours of work, even though he worked 42.5 hours. Carillo Aff. ¶ 14. Carillo "was not paid anything at all for the final six (6) weeks of [his] employment, from September 27, 2020 through November 7, 2020." Carillo Aff. ¶ 17.

Carillo was "never given a wage notice in [his] primary language" and "was never given paystubs that included [his] rate of pay, hours worked, or any other information." Carillo Aff. ¶¶ 18, 19.

### 9. Garcia

Jesus Samir Garcia opted-in as a plaintiff on May 11, 2021 [ECF Nos. 5, 84-2]. He was employed by Defendants from on or about May 5, 2019 until on or about October 10, 2020. Garcia Aff. ¶¶ 1, 6. He was a "manual laborer" who cut bricks and erected scaffolding. Garcia Aff. ¶¶ 4, 5. His regular rate of pay was $32.00 per hour. Garcia Aff. ¶ 9.

Throughout his employment, Garcia worked Monday through Friday from 7:00 a.m. to 3:30 p.m. with a thirty-minute meal break each shift. Garcia Aff. ¶ 7. He worked 40 hours per week. Garcia Aff. ¶ 8.

Some weeks, Garcia was not paid for hours that he worked. Garcia Aff. ¶ 10. For the week of April 12, 2020, he was paid $600.00, "which was for only 18.75 hours of work, even though [he] worked 40 hours." Garcia Aff. ¶ 11. For the week of August 2, 2020, he was paid $750.00,

"which was for only about 23.4 hours of work, even though [he] worked 40 hours." Garcia Aff. ¶ 12.  For the week of August 16, 2020, he was paid $778.00, "which was for only about 24.3 hours of work, even though [he] worked 40 hours." Garcia Aff. ¶ 13.  For the week of August 23, 2020, he was paid $600.00 for 18.75 hours of work, even though he worked 40 hours.  Garcia Aff. ¶ 14. And for the week of September 13, 2020, he was paid $800 for 25 hours of work, even though he worked 40 hours. Garcia Aff. ¶ 15.  Furthermore, Garcia "was not paid anything at all for the final three (3) weeks of [his] employment, from September 20, 2020 through October 10, 2020." Garcia Aff. ¶ 17.

Garcia was "never given a wage notice in [his] primary language" and "was never given paystubs that included [his] rate of pay, hours worked, or any other information."  Garcia Aff. ¶¶ 18, 19.

### 10. Lima

Andres Lima opted-in as a plaintiff in May 2021 [ECF Nos. 20, 84-2].  He was employed by Defendants from on or about July 5, 2020 until on or about October 10, 2020.  Lima Aff. ¶¶ 1, 6.  He was a "manual laborer" who installed stucco.  Lima Aff. ¶¶ 4, 5.  His regular rate of pay was $25.00 per hour.  Lima Aff. ¶ 11.

Throughout his employment, Lima worked Monday through Wednesday from 7:00 a.m. to 3:30 p.m., Thursday from 7:00 a.m. to 4:30 p.m., and Friday from 7:00 a.m. to 5:00 p.m.  Lima Aff. ¶ 7.  He took a thirty-minute meal break each shift.  Lima Aff. ¶ 7.  He also worked one Saturday each month from 9:00 a.m. to 4:00 p.m. with a thirty-minute meal break.  Lima Aff. ¶ 8. During the weeks that Lima worked on Saturday, he worked 49 hours.  Lima Aff. ¶ 9.  He otherwise

worked 42.5 hours.  Lima Aff. ¶ 10.

Lima "was paid straight-time" for the compensated hours he worked.  Lima Aff. ¶ 12.  He was "never paid the overtime premium," even though he worked more than 40 hours each week. Lima Aff. ¶ 18.  In particular, for the week of July 5, 2020, Lima was paid $1,225.00, "which was straight-time for all 49 hours [he] worked that week."  Lima Aff. ¶ 13.

Some weeks, Lima "was not paid for all of [his] hours."  Lima Aff. ¶ 14.  For the week of August 2, 2020, he was paid $800.00, "which was for only 32 hours of work, even though [he] worked at least 42.5 hours."  Lima Aff. ¶ 15.  Likewise, for the week of September 13, 2020, he was paid $800 for 32 hours of work, even though he worked 42.5 hours.  Lima Aff. ¶ 16. Furthermore, Lima "was not paid anything at all for the final three (3) weeks of [his] employment, from September 20, 2020 through October 10, 2020."  Lima Aff. ¶ 19.

Lima was "never given a wage notice in [his] primary language" and "was never given paystubs that included [his] rate of pay, hours worked, or any other information."  Lima Aff. ¶¶ 20, 21.

### 11. Salto

Jorge Salto opted-in as a plaintiff in May 2021 [ECF Nos. 7, 84-2].  He was employed by Defendants from on or about June 28, 2020 until on or about October 10, 2020.  Salto Aff. ¶¶ 1, 6. He was a "manual laborer" who erected scaffolding, brought supplies and materials to job site, and washed bricks.  Salto Aff. ¶¶ 4, 5.  His regular rate of pay was $18.75 per hour.  Salto Aff. ¶ 9.

Throughout his employment, Salto worked Monday through Wednesday from 7:00 a.m. to 3:30 p.m., Thursday from 7:00 a.m. to 4:30 p.m., and Friday from 7:00 a.m. to 5:00 p.m.  Salto Aff. ¶ 7.  He took a thirty-minute meal break each shift.  Salto Aff. ¶ 7.  He worked 42.5 hours per

week.  Salto Aff. ¶ 8.

Salto "was paid straight-time" for the compensated hours he worked.  Salto Aff. ¶ 10.  He was "never paid the overtime premium," even though he worked more than 40 hours each week. Salto Aff. ¶ 16.

Some weeks, Salto was not paid for hours he worked.  Salto Aff. ¶ 11.  For the week of August 2, 2020, he was paid $375.00, "which was for only 20 hours of work, even though [he] worked at least 42.5 hours."  Salto Aff. ¶ 12.  For the week of August 16, 2020, he was paid $712.50, "which was for only 38 hours of work, even though [he] worked at least 42.5 hours." Salto Aff. ¶ 13.  For the week of August 23, 2020, he was paid $450.00, "which was for only 24 hours of work, even though [he] worked at least 42.5 hours."  Salto Aff. ¶ 14.  Moreover, Salto "was not paid anything at all for the final three (3) weeks of [his] employment, from September 20, 2020 through October 10, 2020."  Salto Aff. ¶ 17.

Salto was "never given a wage notice in [his] primary language" and "was never given paystubs that included [his] rate of pay, hours worked, or any other information."  Salto Aff. ¶¶ 18, 19.

### 12. Meglar

Santos Melgar opted-in as a plaintiff in May 2021 [ECF Nos. 21, 84-2].  He was employed by Defendants from on or about July 7, 2019 until on or about October 10, 2020.  Melgar Aff. ¶¶ 1, 6.  He was a "manual laborer" who installed stucco.  Melgar Aff. ¶¶ 4, 5.  His regular rate of pay was $25.00 per hour.  Melgar Aff. ¶ 11.

Throughout his employment, Melgar worked Monday through Wednesday from 7:00 a.m. to 3:30 p.m., Thursday from 7:00 a.m. to 4:30 p.m., and Friday from 7:00 a.m. to 5:00 p.m.  Melgar Aff. ¶ 7.  He took a thirty-minute meal break each shift.  Melgar Aff. ¶ 7.  He also worked two

Saturdays per month from 9:00 a.m. to 4:00 p.m. with a thirty-minute meal break.  Melgar Aff. ¶ 8.  During the weeks that Melgar worked on Saturday, he worked 49 hours.  Melgar Aff. ¶ 9.  He otherwise worked 42.5 hours.  Melgar Aff. ¶ 10.

Melgar "was paid straight-time" for the compensated hours he worked.  Melgar Aff. ¶ 12.  He was "never paid the overtime premium," even though he worked more than 40 hours each week.  Melgar Aff. ¶ 20.  In particular, for the week of August 23, 2020, he was paid $1,225.00, "which was straight-time for the 49 hours [he] worked that week."  Melgar Aff. ¶ 18.

Some weeks, Melgar was not paid anything for hours that he worked.  Melgar Aff. ¶ 13.  For the week of June 14, 2020, he was paid for only 40 hours of work, even though he worked 42.5 hours.  Melgar Aff. ¶ 14.  For the week of August 2, 2020, he was paid $800.00, "which was for only 32 hours of work, even though [he] worked at least 42.5 hours."  Melgar Aff. ¶ 15.  For the week of August 16, 2020, he was paid $875.00, "which was for only 35 hours of work, even though [he] worked at least 42.5 hours."  Melgar Aff. ¶ 16.  For the week of September 13, 2020, he was paid $800 for 32 hours of work, even though he worked 42.5 hours.  Melgar Aff. ¶ 19.  Furthermore, Melgar "was not paid anything at all for the final three (3) weeks of [his] employment, from September 20, 2020 through October 10, 2020."  Melgar Aff. ¶ 21.

Melgar was "never given a wage notice in [his] primary language" and "was never given paystubs that included [his] rate of pay, hours worked, or any other information."  Melgar Aff. ¶¶ 22, 23.

### 13. Jiminez

Daniel Santana Jiminez opted-in as a plaintiff in May 2021 [ECF Nos. 8, 84-2].  He was employed by Defendants from on or about August 16, 2020 until on or about October 10, 2020.

Jiminez Aff. ¶¶ 1, 6. He was a "manual laborer" who installed stucco. Jiminez Aff. ¶¶ 4, 5. His regular rate of pay was $25.00 per hour. Jiminez Aff. ¶ 9.

Throughout his employment, Jiminez worked Monday through Wednesday from 7:00 a.m. to 3:30 p.m., Thursday from 7:00 a.m. to 4:30 p.m., Friday from 7:00 a.m. to 5:00 p.m., and Saturdays from 9:00 a.m. to 4:00 p.m. Jiminez Aff. ¶ 7. He took a thirty-minute meal break each shift. Jiminez Aff. ¶ 7. He worked 49 hours per week. Jiminez Aff. ¶ 8.

Defendants "did not pay [Jiminez] for any of the hours that [he] worked during any week of [his] employment." Jiminez Aff. ¶ 10.

Jiminez was "never given a wage notice in [his] primary language" and "was never given paystubs that included [his] rate of pay, hours worked, or any other information." Jiminez Aff. ¶¶ 13, 14.

### 14. Lazcano

Luis Lazcano opted-in as a plaintiff in May 2021 [ECF Nos. 13, 84-2]. He was employed by Defendants from on or about August 2, 2020 until on or about October 10, 2020. Lazcano Aff. ¶¶ 1, 6. He was a "manual laborer" who installed stucco. Lazcano Aff. ¶¶ 4, 5. His regular rate of pay was $28.75 per hour. Lazcano Aff. ¶ 9.

Throughout his employment, Lazcano worked Monday through Friday from 7:00 a.m. to 3:30 p.m., with a thirty-minute meal break each shift. Lazcano Aff. ¶ 7. He worked 40 hours per week. Lazcano Aff. ¶ 8.

Lazcano "was not paid anything for the final three (3) weeks of [his] employment, from September 20, 2020 through October 10, 2020." Lazcano Aff. ¶ 10.

Lazcano was "never given a wage notice in [his] primary language" and "was never given paystubs that included [his] rate of pay, hours worked, or any other information." Lazcano Aff.

¶¶ 11, 12.

### 15. Benabides

Manuel Benabides opted-in as a plaintiff in May 2021 [ECF Nos. 17, 84-2].  He was employed by Defendants from on or about September 6, 2020 until on or about October 10, 2020.  Benabides Aff. ¶¶ 1, 6.  He was a "manual laborer" who operated forklifts and boom lifts and brought supplies and materials to the masons at job sites. Benabides Aff. ¶¶ 4, 5.  His regular rate of pay was $20.00 per hour.  Benabides Aff. ¶ 11.

Throughout his employment, Benabides worked Monday through Wednesday from 7:00 a.m. to 3:30 p.m., Thursday from 7:00 a.m. to 4:30 p.m., and Friday from 7:00 a.m. to 5:00 p.m. Benabides Aff. ¶ 7.  He took a thirty-minute meal break each shift.  Benabides Aff. ¶ 7.  He also worked two Saturdays each month from 9:00 a.m. to 4:00 p.m. with a thirty-minute meal break. Benabides Aff. ¶ 8.  During the weeks that Benabides worked on Saturday, he worked 49 hours. Benabides Aff. ¶ 9.  He otherwise worked 42.5 hours.  Benabides Aff. ¶ 10.

Benabides "was paid straight-time" for the compensated hours he worked.  Benabides Aff. ¶ 12.  He was "never paid the overtime premium," even though he worked more than 40 hours each week.  Benabides Aff. ¶ 13.  In addition, Benabides "was not paid anything for the final three (3) weeks of [his] employment, from September 20, 2020 through October 10, 2020."  Benabides Aff. ¶ 14.

Benabides was "never given a wage notice in [his] primary language" and "was never given paystubs that included [his] rate of pay, hours worked, or any other information."  Benabides Aff.

¶¶ 15, 16.

### 16. Chumil

Alexander Chumil opted-in as a plaintiff in May 2021 [ECF Nos. 19, 84-2]. He was employed by Defendants from on or about May 3, 2020 until on or about October 10, 2020. Chumil Aff. ¶¶ 1, 6. He was a "manual laborer" who installed stucco. Chumil Aff. ¶¶ 4, 5. His regular rate of pay was $25.00 per hour. Chumil Aff. ¶ 11.

Throughout his employment, Chumil worked Monday through Wednesday from 7:00 a.m. to 3:30 p.m., Thursday from 7:00 a.m. to 4:30 p.m., and Friday from 7:00 a.m. to 5:00 p.m. Chumil Aff. ¶ 7. He took a thirty-minute meal break each shift. Chumil Aff. ¶ 7. He also worked two Saturdays from 9:00 a.m. to 4:00 p.m. with a thirty-minute meal break. Chumil Aff. ¶ 8. During the weeks that Chumil worked on Saturday, he worked 49 hours. Chumil Aff. ¶ 9. He otherwise worked 42.5 hours. Chumil Aff. ¶ 10.

Chumil "was paid straight-time" for the compensated hours he worked. Chumil Aff. ¶ 12. He was "never paid the overtime premium," even though he worked more than 40 hours each week. Chumil Aff. ¶ 13. In addition, Chumil "was not paid anything for the final three (3) weeks of [his] employment, from September 20, 2020 through October 10, 2020." Chumil Aff. ¶ 14.

Chumil was "never given a wage notice in [his] primary language" and "was never given paystubs that included [his] rate of pay, hours worked, or any other information." Chumil Aff. ¶¶ 15, 16.

### 17. Donastorg

Santo Donastorg opted-in as a plaintiff in June 2021 [ECF Nos. 25, 84-2]. He was employed by Defendants from on or about September 20, 2020 until on or about October 3, 2020. Donastorg Aff. ¶¶ 1, 6. He was a "manual laborer" who washed bricks and resupplied other

workers on job sites.  Donastorg Aff. ¶¶ 4, 5.  His regular rate of pay was $25.00 per hour.

Donastorg Aff. ¶ 9.

For his "two (2) weeks of employment," Donastorg worked Monday through Wednesday

from 7:00 a.m. to 3:30 p.m., Thursday from 7:00 a.m. to 4:30 p.m., and Friday from 7:00 a.m. to

5:00 p.m.  Donastorg Aff. ¶¶ 7, 8.  He took a thirty-minute meal break each shift.  Donastorg Aff.

¶ 7.  He worked 42.5 hours each week.  Donastorg Aff. ¶ 8.

"Defendants did not pay [Donastorg] for any of the hours that [he] worked."  Donastorg

Aff. ¶ 10.

Donastorg was "never given a wage notice in [his] primary language" and "was never given

paystubs that included [his] rate of pay, hours worked, or any other information."  Donastorg Aff.

¶¶ 12, 13.

### 18. Rijo

Peter Rijo opted-in as a plaintiff in September 2021 [ECF Nos. 32, 84-2].  He was

employed by Defendants from on or about July 19, 2020 until on or about October 10, 2020.  Rijo

Aff. ¶¶ 1, 6.  He was a "manual laborer" who replaced old bricks.  Rijo Aff. ¶¶ 4, 5.  His regular

rate of pay was $25.00 per hour.  Rijo Aff. ¶ 9.

Throughout his employment, Rijo worked Monday through Wednesday from 7:00 a.m. to

3:30 p.m., Thursday from 7:00 a.m. to 4:30 p.m., and Friday from 7:00 a.m. to 5:00 p.m.  Rijo Aff.

¶ 7.  He took a thirty-minute meal break each shift.  Rijo Aff. ¶ 7.  He worked 42.5 hours each

week.  Rijo Aff. ¶ 8.

Rijo "was paid straight-time" for the compensated hours he worked.  Rijo Aff. ¶ 10.  He

was "never paid the overtime premium," even though he worked more than 40 hours each week.

Rijo Aff. ¶ 11.  In addition, Rijo "was not paid anything for the final three (3) weeks of [his]

employment, from September 20, 2020 through October 10, 2020."  Rijo Aff. ¶ 12.

Rijo was "never given a wage notice in [his] primary language" and "was never given paystubs that included [his] rate of pay, hours worked, or any other information."  Rijo Aff. ¶¶ 13, 14.

### III.    CONCLUSIONS OF LAW

### A.  Plaintiffs' Claims

As noted above, Plaintiffs assert claims for: (1) failure to pay overtime in violation of the FLSA; (2) failure to pay minimum wages in violation of the FLSA; (3) failure to pay overtime in violation of the NYLL; (4) failure to pay minimum wages in violation of the NYLL; (5) failure to pay regular wages in violation of the NYLL; (6) failure to provide wage notices in violation of the NYLL; and (7) failure to provide wage statements in violation of the NYLL.  They seek to recover: overtime wages, pursuant to the FLSA and the NYLL, for sixteen plaintiffs,[4] *see* Pl. PTB at 27–31; unpaid regular wages pursuant to the NYLL, *see* Pl. PTB at 31–33; statutory damages for the failure to provide wages notices and wage statements under the NYLL, *see* Pl. PTB at 33–34; liquidated damages under the NYLL, *see* Pl. PTB at 35–37; pre-judgment and post-judgment interest, *see* Pl. PTB at 37–38; and attorneys' fees and costs, *see* Pl. PTB at 39.

As the Court explains below, Plaintiffs prevail on most, but not all, of their claims.  The sixteen plaintiffs who assert overtime claims may recover all unpaid overtime wages pursuant to the NYLL.  (For two opt-in plaintiffs,[5] the first few weeks of their respective employment periods fall outside of the FLSA statute of limitations, but the NYLL has a longer statute of limitations, and plaintiffs cannot recover under both statutes in any event.)  All of the plaintiffs prevail on all

---

[4] Two plaintiffs, Garcia and Lazcano do not assert overtime claims because they never worked more than 40 hours in a week.
[5] Pachar and Sisalima.

of their claims for failure to pay minimum wages under the FLSA and minimum and regular wages under the NYLL based on Plaintiffs' unchallenged evidence that they worked certain hours and weeks without receiving any compensation at all. For these claims, Plaintiffs may recover all unpaid regular wages under the NYLL. However, Plaintiffs lack standing to assert their wage notice and wage statements claims because they do not demonstrate any injuries from those record-keeping violations that are distinct from the wage violations.

The Court grants Plaintiffs' request for liquidated damages pursuant to the NYLL, instead of the FLSA, so that Plaintiffs may also recover pre-judgment interest. They will also be entitled to post-judgment interest. Finally, the Court grants Plaintiffs leave to file a motion for attorneys' fees and costs.

### B. Applicable Law

#### 1. FLSA and NYLL

"The FLSA and the NYLL both 'guarantee[ ] compensation for all work . . . engaged in by [covered] employees." *Gamero v. Koodo Sushi Corp.*, 272 F. Supp. 3d 481, 496–97 (S.D.N.Y. 2017), *aff'd*, 752 F. App'x 33 (2d Cir. 2018) (quoting *Salinas v. Starjem Rest. Corp.*, 123 F. Supp. 3d 442, 472 (S.D.N.Y. 2015) (quoting *Kuebel*, 643 F.3d at 359)). In general, "[t]o establish liability on a claim for underpayment of wages, 'a plaintiff must prove that he performed work for which he was not properly compensated, and that the employer had actual or constructive knowledge of that work.'" *Gamero*, 272 F. Supp. 3d at 497 (quoting *Salinas*, 123 F. Supp. 3d at 472 (quoting *Kuebel*, 643 F.3d at 361)).

If an employer fails to maintain accurate and complete records, plaintiffs may meet their burden of proof by testifying to "estimates" of the work they performed and the amounts they should have been compensated "based on [the employees'] own recollection[s]." *Kuebel*, 643 F.3d

at 362; *see Anderson*, 328 U.S. at 687; *Reich v. S. New England Telecomms. Corp.*, 121 F.3d 58, 66 (2d Cir. 1997). The burden then shifts to the employer. Under the FLSA, the employer must come forward with evidence to undermine the reasonableness of the employee's evidence. *See, e.g.*, *Gamero*, 272 F. Supp. 3d at 498; *Hernandez v. Jrpac Inc.*, No. 14-cv-4176 (PAE), 2016 WL 3248493, at *27 (S.D.N.Y. June 9, 2016). Under the NYLL, the employer faces a more demanding burden: it "must demonstrate that it in fact paid" what it owed. *Gamero*, 272 F. Supp. 3d at 498; *see* NYLL § 196–a(a); *Canelas v. World Pizza, Inc.*, No. 14-cv-7748 (ER), 2017 WL 1233998, at *9 (S.D.N.Y. Mar. 31, 2017).

### 2. Sanctions

A district court has statutory and inherent authority to preclude evidence as a sanction for discovery violations and failure to comply with court orders. *See Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006); *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 297 (2d Cir. 2006); Fed. R. Civ. P. 37(c)(1). A district court likewise has discretion to enter a default judgment as a sanction for a defendant's noncompliance with discovery rules and court orders, as well as in response to a defendant's withdrawal from litigation. *See Guggenheim Cap., LLC v. Birnbaum*, 722 F.3d 444, 451 (2d Cir. 2013); *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 119 (2d Cir. 2011).[6] Even when a defendant is in default, the Court must be satisfied that "the plaintiff has established a *prima facie* case for recovery." *U.S. Commodity Futures Trading Comm'n v. All City Invs., LLC*, No. 16-cv-7372 (AJN), 2018 WL 2465377, at *2 (S.D.N.Y. June 1, 2018); *see Henry v. Oluwole*, 108 F.4th 45, 55 (2d Cir. 2024) (explaining that, in the context of a default judgment, the district court must be "convinced that the facts meet the elements of the

---

[6] A district court has "inherent power to find a party in contempt for bad faith conduct violating the court's orders 'even if procedural rules exist which sanction the same conduct.'" *S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 144 (2d Cir. 2010) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 49 (1991)).

relevant cause of action—whether those facts are established by well-pleaded allegations or proven by admissible evidence").

The Second Circuit has explained that, whether imposed pursuant to Rule 37 or a district court's inherent power, the preclusion of evidence, a finding of contempt, and the imposition of a default judgment are harsh remedies that must be reserved for rare situations. *See Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988); *S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d at 144–145. However, such "'[s]evere sanctions' may be 'justified.'" *Chevron Corp. v. Donziger*, 833 F.3d 74, 147 (2d Cir. 2016) (quoting *Daval Steel Products v. M/V Fakredine*, 951 F.2d 1357, 1367 (2d Cir. 1991)). Indeed, it may be "necessary" to impose such sanctions when they are warranted, so they remain a "credible deterrent 'rather than a paper tiger.'" *Update Art, Inc.*, 843 F.2d at 71 (quoting *Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1066 (2d Cir. 1979)).

### C. The Sanctions the Court Imposed are Justified.

As set forth in great detail above, in response to Defendants' persistent noncompliance with the Federal Rules of Civil Procedure, court orders, the Court's Individual Rules, and a trial subpoena, in spite of the Court's numerous warnings, the Court precluded Defendants from offering evidence at the trial and ruled that Mr. Koita was in default. The sanctions the Court imposed were justified, pursuant to both the Court's "inherent" authority, *S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d at 144, and Rule 37 based on Defendants' "prior obstruction," *Donziger*, 833 F.3d at 147. At every stage of this case, the Court's warnings and sanctions have been incremental and commensurate with Defendants' noncompliance. *See Donziger*, 833 F.3d at 147. Indeed, defense counsel has conceded that the sanctions were appropriate. *See* Def. PTB at 10; FPTC Tr. at 4:21; Trial Tr. at 8:15.

Defendants were noncompliant from the outset of this case. Nearly four months into the court-ordered discovery schedule, Defendants had not even served Rule 26 Initial Disclosures, let alone responded to any of Plaintiffs' discovery demands [ECF Nos. 37, 38, 39]. Furthermore, they had failed to participate in good faith in the court-ordered mediation by demanding more time to prepare and then simply failing to appear [ECF Nos. 37, 38, 39]. When Plaintiffs filed a letter complaining of Defendants' noncompliance, Defendants failed to respond in accordance with the Court's Individual Rules [ECF No. 39].

The Court began to implement an escalating series of warnings and sanctions. *See In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 673 F. Supp. 3d 345, 354 (S.D.N.Y. 2023) (explaining that a court should impose the least harsh sanction that will serve as an adequate remedy). The Court's first "admonished" Defendants to complete the discovery and warned that "failure to comply with court orders and the Court's Individual Rules may result in sanctions, including monetary sanctions and preclusion of defenses" [ECF No. 39]. At that stage, the Court also specifically directed defense counsel to "inform" Defendants "of this warning" [ECF No. 39]. The Court's admonition and warning had precisely zero effect. Two weeks later, Defendants still had failed to produce any discovery and had failed to appear at a scheduled mediation session [ECF Nos. 40, 41, 42]. Plaintiffs filed a motion to compel [ECF Nos. 40, 41, 42], and Defendants did not respond to the motion.

The Court issued an Order To Show Cause, again warned the defense about sanctions, and again directed defense counsel to "inform Defendants of this second warning" [ECF No. 46]. After the Court ordered Defendants to produce all outstanding discovery, and granted several extensions, Defendants still failed to produce any discovery [ECF Nos. 48, 49, 50, 51, 54].

The Court again warned both defense counsel and Defendants about sanctions, "including monetary sanctions and preclusion of defenses and evidence, because of their repeated failures to heed the Court's order[s] and warnings" [ECF No. 54]. The defense again flouted a court order. As such, the Court granted Plaintiffs' earlier-filed motion to compel and issued yet another Order To Show Cause [ECF No. 55].

The Court held a conference and, based on defense counsel's own representations that he could turn over the discovery by the end of the business day, the Court ordered the defense to do so, thereby giving Defendants another opportunity to put on a defense [ECF Nos. 58, 68]. The Court specifically warned Defendants that any discovery not produced by the deadline would be precluded [ECF No. 58]. Defendants finally produced some discovery, but only after the court-ordered deadline [ECF Nos. 59–65, 66, 67]. Although Plaintiffs asked the Court to preclude the untimely materials [ECF No. 67], the Court declined to impose that harsh sanction, *see Donziger*, 833 F.3d at 147. The Court did sanction the defense in the amount of Plaintiffs' costs in bringing on the motion to compel and ruled that any discovery that Defendants still had not produced would be precluded at trial [ECF No. 68].

Thereafter, despite the Court having already imposed sanctions, Defendants continued their obdurate refusal to meet their basic obligations in this case. They again flouted a court order and the Court's Individual Rules by failing to file required pretrial materials. In particular, as explained in detail above, Defendants failed to submit any direct testimony by affidavit, failed to submit any exhibits, failed to submit a list of Plaintiffs' witnesses they wished to cross-examine, and failed to submit an opposition to any of Plaintiffs' legal arguments. After yet another Order To Show Cause and yet another warning about potential sanctions [ECF No. 77], Defendants failed to offer any reasonable explanation for their conduct. *See* FPTC Tr. at 4:21. The Court ruled that the defense

was precluded from offering evidence that was not timely submitted based on their "pattern of noncompliance." FPTC Tr. at 4:6–5:4, 10:6–7.

The Court expressly warned the defense that Mr. Koita needed to comply with the trial subpoena and appear at the trial and that Defendants were close to defaulting. FPTC Tr. at 9:15–16, 11:25, 12:11–12. When the trial commenced, Mr. Koita failed to appear. The Court ruled that Mr. Koita was in default, not only because of his contempt of a trial subpoena, but also because of his prior obstruction of the discovery process and persistent failure to obey court orders, despite the Court's repeated warnings and prior imposition of sanctions. *See* Trial Tr. at 8:16–9:1. Defense counsel confirmed on the record that he had no objection to the Court's ruling that Mr. Koita was in default. Trial Tr. at 8:15.

The Court is mindful that preclusion of evidence and default judgment are harsh remedies. *S. New England Tel. Co.*, 624 F.3d at 144–145. The Court attempted to advance this case through a carefully considered series of warnings and lesser sanctions before resorting to harsher remedies. This is the rare case in which preclusion of evidence and default judgment are clearly justified. *See Donziger*, 833 F.3d at 147. Given the extraordinary pattern of noncompliance set forth above, and given the Court's numerous warnings that it would sanction the defense, failure ultimately to impose serious sanctions on Defendants would signal that the Federal Rules, court orders, the Court's Individual Rules, and trial subpoenas are all simply optional and that this Court's warnings are meaningless. *See Update Art, Inc.*, 843 F.2d at 71.

The Court is also mindful that the sanctions likely had less punitive impact in this case than similar sanctions might have in other cases. Before the Court precluded any evidence, Defendants had failed to produce, and perhaps never maintained, adequate employment records. *See Kuebel*, 643 F.3d at 362. Moreover, the Court's ruling that the defense could not offer live direct testimony

to compensate for its own failure to submit direct testimony by affidavit, as required by the Court's Individual Rules, did not eliminate a stable of potential defense witnesses. Rather, defense counsel made clear that Mr. Koita would be his only witness. *See* FPTC Tr. at 5:4–6. Even after the Court's ruling, the defense still would have been able to elicit testimony from Mr. Koita on cross-examination. But Mr. Koita ignored a trial subpoena and failed to appear at the trial to testify. Finally, although the Court has properly ruled that Mr. Koita is in default, the Court does not rely on the allegations in the Complaint for any issue. In other words, the Court relies on Plaintiffs' unchallenged evidence in this case because of Defendants' total failure of proof, not in significant part because of the Court's imposition of harsh sanctions.

### D. Opt-In Plaintiffs, Statutes of Limitations

The Court now turns to the merits of Plaintiffs' case. The Court again stresses that, though given a final opportunity to do so in their Post-Trial Brief, Defendants do not contest any element of either defendant's liability. Nevertheless, the Court must be satisfied that Plaintiffs are entitled to recover before entering judgment in their favor. *See U.S. Commodity Futures Trading Comm'n*, 2018 WL 2465377, at *2; *Henry*, 108 F.4th at 55.

Plaintiffs' counsel seeks to recover various damages on behalf of Plaintiff Efren Garrido and the seventeen opt-in plaintiffs who joined this FLSA action pursuant to 29 U.S.C. § 216(b). Section 216(b) provides, in relevant part that an "employee" may become a "party plaintiff" if "he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b). Here, the seventeen opt-in plaintiffs who filed consents on the docket [ECF No. 84-2] have agreed "to be bound by the judgment (and to benefit from it)." *Hoffmann v. Sbarro, Inc.*, 982 F. Supp. 249, 260 (S.D.N.Y. 1997).

The FLSA permits a plaintiff to commence an action to recover wages within two years

after his claim accrues.  29 U.S.C. § 255(a).  For each opt-in plaintiff, the statute of limitations was

tolled upon his "opting in" to the action by filing a consent to become a party plaintiff.  *Soler v. G*

*& U, Inc.*, 86 F.R.D. 524, 528–29 (S.D.N.Y. 1980).  The NYLL provides a six-year limitations

period.  *See* N.Y. Lab. Law § 198(3); N.Y. Lab. Law § 663(3).

If an employer's violation of the FLSA was "willful," the FLSA limitations period extends

to three years.  29 U.S.C. § 255(a).  "An employer willfully violates the FLSA when it either knew

or showed reckless disregard for the matter of whether its conduct was prohibited by the Act."

*Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 324 (2d Cir. 2021) (quoting *Young v. Cooper*

*Cameron Corp.*, 586 F.3d 201, 207 (2d Cir. 2009)).  "Mere negligence is insufficient."  *Young*,

586 F.3d at 207.  "The burden is on the employee to show willfulness."  *Id.*

Plaintiffs' counsel argues that "the FLSA's three (3) year statute of limitations, as well as

the NYLL's six (6) year statute of limitations, covers [all of] Plaintiffs' claims for the entirety of

their respective periods of employment."  Pl. PTB at 24.  All of Plaintiffs' claims clearly fall within

the six-year statute of limitations for claims under the NYLL, and the vast majority of claims fall

within the two-year limitations period to recover wages under the FLSA.  For example, Garrido

began his employment in August 2020 and filed this lawsuit in March 2021 [ECF No. 1]. Garrido

Aff. ¶ 5.  Fourteen other plaintiffs opted-in to this lawsuit within two years after they began their

respective periods of employment.[7]  *See* Alcoser Aff. ¶ 6 [ECF No. 8] (opted-in less than one year

after he began his employment); Naula Aff. ¶ 6 [ECF No. 23] (less than two years); Marquez Aff.

¶ 6 [ECF No. 16] (about one year); Mura Aff. ¶ 6 [ECF No. 18] (less than two years); Carillo Aff.

¶ 6 [ECF No. 14] (about 13 months); Lima Aff. ¶ 6 [ECF No. 20] (less than one year); Salto Aff.

---

[7] Plaintiffs' claims accrued upon the violations of the statutes (*i.e.* non-payment of regular wages or overtime wages).
The Court focuses on when Plaintiffs began their periods of employment because they contend the violations began
right away.

¶ 6 [ECF No. 7] (about 13 months); Melgar Aff. ¶ 6 [ECF No. 21] (about 14 months); Jiminez Aff.

¶ 6 [ECF No. 8] (less than one year); Lazcano Aff. ¶ 6 [ECF No. 13] (less than one year); Benabides

Aff. ¶ 6 [ECF No. 17] (less than one year); Chumil Aff. ¶ 6 [ECF No. 19] (about one year);

Donastorg Aff. ¶ 6 [ECF No. 25] (less than one year); Rijo Aff. ¶ 6 [ECF No. 31] (about 14

months).  Pachar, Sisalima, and Garcia opted-in to this lawsuit slightly more than two years after

they began their respective periods of employment.  *See* Pachar Aff. ¶ 6 [ECF No. 22] (began his

employment on May 5, 2019 and opted-in May 27, 2021); Sisalima Aff. ¶ 6 [ECF No. 24] (began

his employment May 5, 2019 and opted-in June 3, 2021); Garcia Aff. ¶ 6 [ECF No. 5] (began his

employment May 5, 2019 and opted-in May 11, 2021).

The Court concludes that Plaintiffs have not demonstrated the willfulness required to

extend the FLSA statute of limitations period from two to three years with respect to their FLSA

overtime claims.  As such, for Pachar and Sisalima, who filed their consents to joint this lawsuit

slightly more than two years after they began their respective periods of employment, the statute

of limitations has expired on their FLSA overtime claims for those first few weeks of

employment.[8]  However, these plaintiffs may still recover unpaid overtime for those first few

weeks under the NYLL.  Moreover, Plaintiffs have shown willfulness with respect to the failure

to pay minimum wages under the FLSA.[9]

Plaintiffs contend that all of "Defendants' wage violations were willful," Pl. PTB at 36,

because Koita admitted at his deposition that he "did not" do research to determine what legal

obligations F&M had with regard to paying its employees, Koita Depo. at 63:13–18; *see id.* at

66:9–13.  Koita also stated that he did not know whether employees who work more than 40 hours

---

[8] Garcia does not assert overtime claims.

[9] Garcia, who filed his consent just past the two-year mark, does assert FLSA minimum wage claims.

in a week are entitled to overtime pay. Koita Depo. at 65:2–5; *see* Pl. PTB at 36–37.

Plaintiffs' evidence does not show that Defendants either knew or recklessly disregarded that their conduct violated the overtime requirement of the FLSA. Koita specifically testified that he did not know what the law required. *See* Koita Depo. at 65:2–5, 66:9–13; *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988) (the ordinary statute of limitations applies to "ignorant" employers). Moreover, Koita's admitted failure to research his legal obligations, Koita Depo. at 63:13–18, may have been unreasonable but it was not reckless. *See McLaughlin*, 486 U.S. at 134. In the Second Circuit, a finding of recklessness requires "an extreme departure from the standards of ordinary care." *McLean v. Garage Mgmt. Corp.*, No. 09-cv-9325 DLC, 2012 WL 1358739, at *7 (S.D.N.Y. Apr. 19, 2012) (quoting *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009)). Koita's deposition testimony reflects ignorance that may have been unreasonable (*i.e.* negligent), but there is nothing in the record to demonstrate that it was willful or extreme. *See McLaughlin*, 486 U.S. at 133–34. The Second Circuit has instructed that "if an employer acts unreasonably, but not recklessly, in determining its legal obligation, its action should not be considered willful." *Parada v. Banco Indus. De Venezuela, C.A.*, 753 F.3d 62, 71 (2d Cir. 2014) (alteration omitted) (quoting *Reich v. Waldbaum*, Inc., 52 F.3d 35, 39 (2d Cir. 1995)). Thus, the Court concludes that the limitations period for plaintiffs' FLSA overtime claims is two years. *See*, 753 F.3d at 71.

In contrast with the FLSA overtime claims, the Court concludes that the applicable statute of limitations for plaintiffs' FLSA minimum wage claims is three years. As stated above, relying on Plaintiffs' unrebutted evidence, the Court has found that Defendants failed to pay each plaintiff "anything at all" for some of the hours that plaintiff worked, including by failing to pay any of these employees any wages starting in late September 2020. Alcoser Aff. ¶ 14; *see* Garrido Aff. ¶

14; Naula Aff. ¶ 17; Marquez Aff. ¶ 13; Mura Aff. ¶¶ 13, 14; Pachar Aff. ¶¶ 13, 14; Sisalima Aff.

¶¶ 13, 14; Carillo Aff. ¶¶ 10, 11, 17; Garcia Aff. ¶¶ 10–15, 17; Lima Aff. ¶¶ 14, 16, 19; Salto Aff.

¶¶ 11–15, 17; Melgar Aff. ¶¶ 13–16, 19, 21; Jiminez Aff. ¶ 10; Lazcano Aff. ¶ 10; Chumil Aff. ¶

14; Donastorg Aff. ¶ 10; Rijo Aff. ¶ 12.   Failing to pay employees any wages for their work does

represent "an extreme departure" from an employer's ordinary standard of care.  *McLean*, 2012

WL 1358739, at *7; *see Pinovi v. FDD Enterprises, Inc.*, No. 13-cv-2800 (GBD)(KNF), 2015 WL

4126872, at *4 (S.D.N.Y. July 8, 2015) (finding that "paying Plaintiff on average less than $5 per

hour to work daily twelve-hour shifts" was an "extreme departure" and an "obvious" violation that

warranted finding willfulness).

      For the completeness of the discussion, the Court notes that it cannot simply accept as true

the conclusory assertions in the Complaint that Defendants' FLSA violations were willful for the

purpose of extending the FLSA statute of limitations period from two to three years.  *See* Cmpl.

¶¶ 94, 99.  The Court is aware that other courts in this district have concluded that "[w]here a

default judgment is entered against a defendant under the FLSA, allegations that the violations

were willful are deemed admitted."  *Gurung v. Malhotra*, 851 F. Supp. 2d 583, 591 (S.D.N.Y.

2012) (quoting *Pineda v. Masonry Const., Inc.*, 831 F. Supp. 2d 666, 674 (S.D.N.Y. 2011) and

citing *Fisher v. Vassar Coll.*, 70 F.3d 1420, 1452 (2d Cir. 1995) (holding that a defendant waived

a statute of limitations defense on appeal by failing to raise it in the district court)).  However, even

when a defendant is in default, the Court must be satisfied that a "plaintiff has established a *prima

facie* case for recovery." *U.S. Commodity Futures Trading Comm'n*, 2018 WL 2465377, at *2; *see

Henry*, 108 F.4th at 55.  Since default judgments are disfavored, the Court generally is not inclined

to rule that a plaintiff has made a *prima facie* case for recovery on a claim for which the statute of

limitations has run.  *See De Santis v. City of New York*, No. 10-cv-3508 (JPO), 2014 WL 228659,

at *6 (S.D.N.Y. Jan. 22, 2014). Moreover, while a defendant can waive a statute of limitations defense in a variety of ways, *see Fisher*, 70 F.3d at 1452, the Second Circuit has stressed—albeit at the pleading stage of a wage and hours case—that "a court need not accept as true a plaintiff's conclusory allegation that a defendant willfully violated the FLSA," *Whiteside*, 995 F.3d at 321. Further, since Plaintiffs requested, and the Court granted, a default judgment against Mr. Koita only, it would not be appropriate to rule that F&M willfully violated the FLSA based on conclusory allegations in the Complaint.

This discussion of FLSA limitations periods is academic here, however. The six-year statute of limitations for claims under the NYLL comfortably embraces the entire period of each plaintiff's employment. *See supra*; N.Y. Lab. Law § 198(3); N.Y. Lab. Law § 663(3). The NYLL requires employers to pay employees who work more than 40 hours per week precisely the same overtime premium that the FLSA requires. *See* 29 U.S.C. § 207(a)(1); N.Y. Lab. Law §§ 650 *et seq.*; 12 N.Y.C.R.R. § 142-2.2; *Gamero*, 272 F. Supp. 3d at 499 (citing *Dejesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 88 n.5 (2d Cir. 2013)). "Obviously, plaintiffs are not entitled to recover twice under both the FLSA and NYLL for the same injury." *Hengjin Sun v. China 1221, Inc.*, No. 12-cv-7135 (RJS), 2016 WL 1587242, at *2 (S.D.N.Y. Apr. 19, 2016) (internal quotation marks and citations omitted); *see Jrpac Inc.*, 2016 WL 3248493, at *31. For the sake of simplicity, the Court exercises its discretion to award all of the overtime damages plaintiffs seek under the NYLL. *See China 1221, Inc.*, 2016 WL 1587242, at *2. Moreover, the damages for Plaintiffs' minimum wage claims under both the FLSA and NYLL are "subsume[d]" by their awards for regular wages under the NYLL, since their regular wages were much higher than the minimum wage. *See Jrpac Inc.*, 2016 WL 3248493, at *31.

44

### E.  Koita Was an Employer.

Plaintiffs seek to recover against both F&M and Mr. Koita.  Defendants do not dispute in their Post-Trial Brief that both F&M and Mr. Koita employed Plaintiffs.  The Court has already make a factual finding, based on Plaintiffs' unchallenged affidavits, that F&M employed each of the plaintiffs who remains in this case.  *Supra* at 14.  The Court also concludes, as a matter of law, that Mr. Koita is personally liable as an employer under the FLSA and NYLL.

"The statutory standard for employer status under the NYLL is nearly identical to that of the FLSA," and, thus, the Court performs only one analysis.  *Jrpac Inc.*, 2016 WL 3248493, at *22.  An employer "includes any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d); *see* N.Y. Lab. Law § 190(3).  It is an expansive term.  *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992); *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999).  It is well-established that employees may simultaneously have multiple employers.  *Jrpac Inc.*, 2016 WL 3248493, at *21.  Each employer is jointly and severally liable for all back wages and liquidated damages.  *See Moon v. Kwon*, 248 F. Supp. 2d 201, 236–238 (S.D.N.Y. 2002).

In determining whether an individual defendant is an employer, a district court considers "whether the individual: '(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.'"  *Gillian v. Starjem Rest. Corp.*, No. 10-cv-6056 (JSR), 2011 WL 4639842, at *4 (S.D.N.Y. Oct. 4, 2011) (quoting *Carter v. Dutchess Community College*, 735 F.2d 8, 12 (2d Cir. 1984)).  No single factor is dispositive.  *See Herman*, 172 F.3d at 139.  Employer "status does not require continuous monitoring of employees" or "any sort of absolute control."  *Herman*, 172 F.3d at 139.

Mr. Koita falls within the expansive definition of an employer. Defendants do not dispute this, and Mr. Koita confirmed it with his deposition testimony. He was the owner and president of F&M. *See* Koita Depo. at 15:8–19:7. In that capacity, he had the authority to hire and fire employees and to determine employees' hours and pay. Koita Depo. at 27:6–9, 28:23–25, 29:22–23. It was Mr. Koita's responsibility to maintain records of the time employees worked and to make sure employees were paid properly. Koita Depo. at 29:2–4, 31:22–25. At his deposition, Mr. Koita testified that his daily supervision of employees was "limited," and other people, such as "the project manager on [a] job site," often supervised the employees. Koita Depo. at 77:15–25. Mr. Koita, however, admitted that he did supervise employees, *see* Koita Depo. at 77:24–78:16, and his "continuous" supervision is not a prerequisite for the Court's conclusion that Mr. Koita was an employer, *Herman*, 172 F.3d at 139.

### F. Damages

The sole argument in Defendants' Post-Trial Brief is that the Court should hold an inquest on damages. Def. PTB at 10. The defense acknowledges that, given its failure to maintain and produce adequate employment records, the Court may rely on Plaintiffs' estimates of their hours and pay. Def. PTB at 4 (citing *Anderson*, 328 U.S. at 687). Nevertheless, Defendants request another chance to contest Plaintiffs' damages evidence because, the defense asserts, Plaintiffs' affidavits are "vague and non-specific." Def. PTB at 10.

Defendants' argument is meritless. Plaintiffs' affidavits are detailed and specific, which is reflected in the Court's detailed and specific factual findings, based on Plaintiffs' affidavits, about Plaintiffs' hours and wages. *See supra* at 15–31. Plaintiffs' affidavits are clearly sufficient to support the Court's rulings on damages set forth below. As the Court made unmistakably clear at the Final Pretrial Conference, after Defendants failed to submit any evidence as to damages in

advance of the bench trial, Defendants' final opportunity to challenge Plaintiffs' evidence was at the trial. *See* FPTC Tr. at 12:17–20 (warning Defendants that Plaintiffs' detailed affidavits would be the record on damages unless Defendants were able to undermine Plaintiffs' evidence at the trial). Defendants failed to challenge Plaintiffs' evidence or to put on any defense with respect to damages at the trial.

The Second Circuit has made clear that it is "not necessary for the district court to hold a hearing to fix damages" where it instead calculates damages based "'upon detailed affidavits and documentary evidence.'" *Tamarin v. Adam Caterers, Inc.*, 13 F.3d 51, 54 (2d Cir. 1993) (quoting *Fustok v. ContiCommodity Services, Inc.*, 873 F.2d 38, 40 (2d Cir. 1989)); *see also Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999) (any award of damages must be established to a "reasonable certainty" based on admissible evidence). Contrary to Defendants' assertion, Plaintiffs' affidavits are detailed and specific. There is no need for an inquest in this case. *See Tamarin*, 13 F.3d at 54. By requesting an inquest, Defendants are effectively asking to redo the trial on damages, but Defendants are not entitled to new trial merely because they chose not to put on "any case" at the trial the Court held. Trial Tr. at 9:5–9.

### 1. Unpaid Regular Wages and Overtime

Plaintiffs are entitled to collect their unpaid regular wages pursuant to the NYLL. The NYLL requires employers to pay manual workers their regular wages no more than seven days after the end of the week in which the wages are earned. *See* N.Y. Lab. Law § 191(1). When employers fail to pay, "[e]mployees are entitled to recover such unpaid wages." *Erdemir v. Allstate Marble & Granite, Kitchens & Baths Inc.*, 2023 WL 8270891, at *20 (E.D.N.Y. Nov. 30, 2023); *see* 12 N.Y.C.R.R. § 142-2.2; N.Y. Lab. Law § 198. (As noted above, Plaintiffs succeed on their minimum wage claims under the FLSA and NYLL, but damages for those claims are subsumed

by the much higher damages for their unpaid regular wages.  *See Jrpac Inc.*, 2016 WL 3248493, at *31.)  The evidence establishes that Defendants failed to pay the plaintiffs their regular wages by either paying for only a portion of the hours worked, or failing to pay for full weeks of work. The Court's calculations of each plaintiff's damages are based on the factual findings set forth in greater detail above

The sixteen plaintiffs who assert overtime claims are entitled to recover damages based on the estimates of their hours and regular wages in Plaintiffs' affidavits.  *See Kuebel*, 643 F.3d at 362.  As explained above, these plaintiffs assert overtime claims under both the FLSA and NYLL. Where plaintiffs assert claims under both statutes, "the Court has discretion to award Plaintiffs damages under the statute providing the greatest amount of relief."  *China 1221, Inc.*, 2016 WL 1587242, at *2; *accord Gamero*, 272 F. Supp. 3d at 498.  Because of the FLSA statute of limitations, all plaintiffs may recover all unpaid overtime under the NYLL only.  As such, the Court proceeds with its calculation of overtime damages under the NYLL.

The NYLL requires employers to compensate employees who work more than forty hours in a week with overtime pay at the rate of one and one-half times the regular rate of pay.  *See* NY. Lab. Law §§ 198(1–a), 663(1).  Thus, in calculating overtime pay under the NYLL, the Court must determine the employee's regular rate of pay and the number of overtime hours he worked.  *See* 12 NYCRR § 142–2.2; *Pineda v. Masonry Const., Inc.*, 831 F. Supp. 2d 666, 676–77 (S.D.N.Y. 2011).  In determining the number of overtime hours, the Court excludes "bona fide meal breaks." *Gamero*, 272 F. Supp. 3d at 499; *Jrpac*, 2016 WL 3248493, at *27.

### i.   Garrido

Garrido's regular rate of pay was $40.00 per hour.  Garrido Aff. ¶ 13.  During his first week of employment, he did not work any overtime.  *See* Garrido Aff. ¶ 7.  Thereafter, for seven weeks,

Garrido worked 2.5 hours of overtime every Monday through Friday, plus 6.5 additional hours of overtime on three Saturdays. *See* Garrido Aff. ¶¶ 9, 10, 11. Garrido worked a total of 37 hours of overtime (2.5x7 + 6.5x3). Garrido was not paid anything for the 37 overtime hours he worked, *see* Garrido Aff. ¶ 14, but he should have been compensated at a rate of $60 per hour, *see* NY. Lab. Law §§ 198(1–a), 663(1). Thus ($60x37 = $2,220.00), the Court finds that Garrido is entitled to $2,220.00 in overtime damages [ECF No. 84-26].

In addition, Garrido was paid for only 28.75 hours of his first week of work, even though he had worked 33 hours that week. *See* Garrido Aff. ¶¶ 7, 14. He was not paid regular wages for any other week of his employment. *See* Garrido Aff. ¶ 14. Garrido is entitled to $12,010.00 in damages for unpaid regular wages [ECF No. 84-26].

Garrido is entitled to a total of $14,230.00 in unpaid wages.

### ii.    Alcoser

Alcoser's regular rate of pay was $32.00 per hour. Alcoser Aff. ¶ 11. From June 28, 2020 until September 12, 2020, Alcoser worked 54 hours per week. Alcoser Aff. ¶ 8. For 14 hours of overtime each week for eleven weeks (a total of 154 overtime hours), Alcoser should have been compensated at a rate of $48.00 per hour, but he was paid only his regular rate of $32.00 per hour. *See* Alcoser Aff. ¶¶ 12, 13. As such ($48-$32 = $16, and 154x$16 = $2,464.00), Alcoser is entitled to $2,464.00 in overtime damages [ECF No. 84-38].

In addition, Alcoser "was not paid anything at all for the final three (3) weeks of [his] employment," during which time he worked 40 hours per week. Alcoser Aff. ¶ 14. Alcoser is

thus entitled to $3,840.00 in damages for unpaid regular wages [ECF No. 84-38].

Alcoser is entitled to a total of $6,304.00 in unpaid wages.

### iii.    Naula

Naula's regular rate of pay was $34.00 per hour.  Naula Aff. ¶ 11.  He worked 47.5 hours two weeks per month for twelve months.  *See* Naula Aff. ¶¶ 6, 8, 9.  In other words, Naula worked 7.5 hours of overtime for 26 weeks (195 hours of overtime).  Naula should have been compensated at a rate of $51.00 per hour for those overtime hours but was instead paid his regular rate of pay.  *See* Naula Aff. ¶¶ 12, 16.  As such ($51-$34 = $17, and $17x195 = $3,315.00), Naula is entitled $3,315.00 in overtime damages [*cf.* ECF No. 84-33].

In addition, Naula was not paid for all of his hours the week of August 2, 2020, *see* Naula Aff. ¶¶ 13, 14, and "was not paid anything at all for the final two (2) weeks of [his] employment," Naula Aff. ¶ 17.  Naula is entitled $2,720.00 in unpaid regular wages [ECF No. 84-33].

Naula is entitled to a total of $6,035.00 in unpaid wages.

### iv.    Marquez

Marquez's regular rate of pay was $27.50 per hour.  Marquez Aff. ¶ 11.  Marquez worked 2.5 hours of overtime for 18 weeks of his employment and 9 hours of overtime for 5 weeks of his employment.  *See* Marquez Aff. ¶¶ 6, 9, 10.  He should have been compensated at a rate of $41.25 per hour for 90 total hours of overtime but he was instead paid his regular rate of pay.  *See* Marquez Aff. ¶¶ 12, 19.  Thus ($41.25-$27.50 = $13.75, and $13.75x90 = $1,237.50), Marquez is entitled to $1,237.50 in overtime damages [ECF No. 84-30].

In addition, Marquez was paid for only a portion of the hours he worked durings the weeks of August 2, 2020, August 9, 2020, August 16, 2020, and September 13, 2020.  *See* Marquez Aff. ¶¶ 14, 16, 17, 18.  He was not paid anything for the final three weeks of his employment.  Marquez

Aff. ¶ 20.  Marquez is entitled to $4,255.63 in unpaid regular wages [ECF No. 84-30].

Marquez is entitled to a total of $5,493.13 in unpaid wages.

    **v.**    **Mura**

Mura's regular rate of pay was $25.00 per hour.  Mura Aff. ¶ 11.  He worked 6.5 hours of overtime for 23 weeks of his employment (149.5 total overtime hours).  *See* Mura Aff. ¶¶ 6, 8, 9. For those hours, he should have been compensated at a rate of $37.50 per hour, but he was paid his regular rate.  *See* Mura Aff. ¶¶ 12, 16.  Thus ($37.50-$25.00 = $12.50, and $12.50x149.5 = $1,868.75), Mura is entitled to $1,868.75 in overtime damages [ECF No. 84-32].

In addition, Mura was not paid for all of the hours he worked the week of August 2, 2020, Mura Aff. ¶¶ 13, 14, and was not paid anything for the final three weeks of his employment, Mura Aff. ¶ 17.  Mura is entitled to $3,362.50 in unpaid regular wages [ECF No. 84-32].

Mura is entitled to a total of $5,231.25 in unpaid wages.

    **vi.**    **Pachar**

Pachar's regular rate of pay was $27.50 per hour.  Pachar Aff. ¶ 11.  He worked 2.5 hours of overtime for 73 weeks and 9 hours of overtime for 2 weeks (200.5 total hours of overtime).  *See* Pachar Aff. ¶¶ 6, 9, 10.  He should have been compensated at a rate of $41.25 per hour for his 200.5 hours of overtime, but he received only his regular rate of pay.  *See* Pachar Aff. ¶¶ 12, 19. Accordingly ($41.25-$27.50 = $13.75, and $13.75x200.5 = $2,756.875), Pachar is entitled to $2,756.875 in overtime damages [*cf.* ECF No. 84-34].

In addition, Pachar was not paid regular wages for all of the hours he worked the weeks of August 2, 2020, August 9, 2020, and August 23, 2020.  *See* Pachar Aff. ¶¶ 13, 14, 16, 18.  He was not paid anything for the final three weeks of his employment.  Pachar Aff. ¶ 20.  Pachar is entitled

to $3,932.50 in unpaid regular wages [ECF No. 84-34].

Pachar is entitled to a total of $6,689.375 in unpaid wages.

### vii.    Sisalima

Sisalima's regular rate of pay was $27.50 per hour.  Sisalima Aff. ¶ 11.  He worked 2.5 hours of overtime each week for 41 weeks of his employment and 9 hours of overtime each week for 34 weeks (102.5+306 = 408.5 total overtime hours).  *See* Sisalima Aff. ¶¶ 9, 10, 17, 18.  He should have been compensated at a rate of $41.25 for his 408.5 overtime hours but he received only his regular rate of pay of $27.50 per hour.  *See* Sisalima Aff. ¶¶ 12, 20.  As such ($41.25-$27.50 = $13.75, and $13.75x408.5 = $5,616.875), Sisalima is entitled to $5,616.875 in overtime damages [*cf.* ECF No. 84-37].

In addition, Sisalima was not paid regular wages for all of the hours he worked the weeks of August 2, 2020, August 9, 2020, and August 23, 2020.  *See* Sisalima Aff. ¶¶ 13, 14, 16, 19.  He was not paid anything for the final three weeks of his employment.  Sisalima Aff. ¶ 21.  Sisalima is entitled to $3,932.50 in unpaid regular wages [ECF No. 84-37].

Sisalima is entitled to a total of $9,549.375 in unpaid wages.

### viii.    Carrillo

Carrillo's regular rate of pay was $35.00 per hour.  Carillo Aff. ¶ 9.  He worked 2.5 hours of overtime each week of his employment, which spanned 29 weeks (72.5 total hours of overtime), but he was not paid anything for those overtime hours.  *See* Carillo Aff. ¶¶ 8, 10, 16.  As such, for 72.5 hours of overtime compensated at a rate of $52.50 per hour, Carillo is entitled to $3,806.25 in overtime damages [ECF No. 84-22].

In addition, Carrillo was not paid regular wages for all of the hours he worked the weeks of August 2, 2020, August 16, 2020, and September 13, 2020.  *See* Carillo Aff. ¶¶ 11, 12, 13, 14.  He

was not paid anything for the final six weeks of his employment. Carillo Aff. ¶ 17. Thus, Carillo is entitled to $9,030 in unpaid regular wages [ECF No. 84-22].

Carillo is entitled to a total of $12,836.25 in unpaid wages.

### ix. Garcia

Garcia's regular rate of pay was $32.00 per hour. Garcia Aff. ¶ 9. He never worked more than 40 hours per week. *See* Garcia Aff. ¶ 8. As such, Garcia is not entitled to any damages for uncompensated overtime.

Garcia was not paid regular wages for all of the hours he worked the weeks of April 12, 2020, August 2, 2020, August 16, 2020, August 23, 2020, and September 13, 2020. *See* Garcia Aff. ¶¶ 10–15. He was not paid anything for the final three weeks of his employment. Garcia Aff. ¶ 17. Garcia is entitled to $6,713.60 in unpaid regular wages [ECF No. 84-25].

Garcia is entitled to a total of $6,713.60 in unpaid wages.

### x. Lima

Lima's regular rate of pay was $25.00 per hour. Lima Aff. ¶ 11. He worked 2.5 hours of overtime each week for 11 weeks of his employment and 9 hours of overtime for three weeks (27.5+27 = 54.5 total overtime hours). *See* Lima Aff. ¶¶ 9, 10. He should have been compensated at a rate of $37.50 for his 54.5 hours of overtime but received only his regular rate of pay. *See* Lima Aff. ¶¶ 12, 18. Accordingly ($37.50-$25.00 = $12.50, and $12.50x54.5 = $681.25), Lima is entitled to $681.25 in overtime damages [ECF No. 84-29].

In addition, Lima was paid regular wages for only a portion of the hours he worked the weeks of August 2, 2020 and September 13, 2020. *See* Lima Aff. ¶¶ 14, 15, 16. He was not paid anything for the final three weeks of his employment. Lima Aff. ¶ 19. Lima is owed $3,712.50

in unpaid regular wages [ECF No. 84-29].

Lima is entitled to a total of $4,393.75 in unpaid wages.

### xi.    Salto

Salto's regular rate of pay was $18.75 per hour.  Salto Aff. ¶ 9.  He worked 2.5 hours of overtime every week of his employment, which spanned 15 weeks (37.5 total hours of overtime).  *See* Salto Aff. ¶¶ 7, 8.  He should have been compensated at a rate of $28.13 per hour for his 37.5 total hours of overtime, *see* Salto Aff. ¶¶ 6, 8, but he was paid only his regular rate, *see* Salto Aff. ¶¶ 10, 16.  As such ($28.13-$18.75 = $9.38, and $9.38x37.5 = $351.75), Salto is entitled to $351.75 in overtime damages [ECF No. 84-36].

In addition, Salto was paid regular wages for only a portion of the hours he worked the weeks of August 2, 2020, August 16, 2020, and August 23, 2020.  *See* Salto Aff. ¶¶ 11, 12, 13, 14.  He was not paid anything for the final three weeks of his employment.  Salto Aff. ¶ 17.  Salto is entitled to $3,243.78 in unpaid regular wages [ECF No. 84-36].

Salto is entitled to a total of $3,595.53 in unpaid wages.

### xii.    Melgar

Melgar's regular rate of pay was $25.00 per hour.  Melgar Aff. ¶ 11.  He worked 2.5 hours of overtime for 36 weeks of his employment and 9 hours of overtime for 30 weeks (90+270 = 360 total overtime hours).  *See* Melgar Aff. ¶¶ 9, 10.  Although he should have been compensated at a rate of $37.50 for those overtime hours, he received only his regular rate of pay.  *See* Melgar Aff. ¶¶ 12, 20; *see also* Melgar Aff. ¶ 18.  Thus ($37.50-$25.00 = $12.50, and $12.50x360 = $4,500.00), Melgar is entitled to $4,500.00 in overtime damages [ECF No. 84-31].

In addition, Melgar was paid regular wages for only a portion of the hours he worked the weeks of August 2, 2020, August 16, 2020, and September 13, 2020.  *See* Melgar Aff. ¶¶ 13, 15,

16, 19. He was not paid anything for the final three weeks of his employment. Melgar Aff. ¶ 21. Melgar is entitled to $3,962.50 in unpaid regular wages [ECF No. 84-31].

Melgar is entitled to a total of $8,462.50 in unpaid wages.

### xiii.    Jiminez

Jiminez's regular rate of pay was $25.00 per hour. Jiminez Aff. ¶ 9. He worked 49 hours per week from August 16, 2020 until October 10, 2020. *See* Jiminez Aff. ¶¶ 6, 8. He was never paid for any of his work. Jiminez Aff. ¶ 10. Thus ($25.00x40x8 = $8,000.00, and $37.50x9x8 = $2,700.00), Jiminez is entitled to $8,000.00 in unpaid regular wages and $2,700.00 in overtime damages [ECF No. 84-27].

Jiminez is entitled to a total of $10,700.00 in unpaid wages.

### xiv.    Lazcano

Lazcano's regular rate of pay was $28.75 per hour. Lazcano Aff. ¶ 9. He always worked 40 hours per week, *see* Lazcano Aff. ¶ 8, so he is not entitled to overtime damages.

Lazcano was not paid anything for the final three weeks of employment. Lazcano Aff. ¶ 10. As such, he is entitled to $3,450.00 in unpaid regular wages [ECF No. 84-28].

Lazcano is entitled to a total of $3,450.00 in unpaid wages.

### xv.    Benabides

Benabides' regular rate of pay was $20.00 per hour. Benabides Aff. ¶ 11. He worked 2.5 hours of overtime for three weeks of his employment and 9 hours of overtime for two weeks (7.5+18 = 25.5 total overtime hours). *See* Benabides Aff. ¶¶ 9, 10. Although he should have been compensated at a rate of $30 per hour for his overtime hours, Benabides only ever received only his regular rate of pay. *See* Benabides Aff. ¶¶ 12, 13. Thus ($30-$20 = $10, and $10x25.5 = $255),

Benabides is entitled to $255.00 in overtime damages [ECF No. 84-39].

Moreover, Benabides was not paid anything for the final three weeks of his employment. Benabides Aff. ¶ 14.  As such, Benabides is entitled to $2,550.00 in unpaid regular wages [ECF No. 84-39].

Benabides is entitled to a total of $2,805 in unpaid wages.

### xvi.    Chumil

Chumil's regular rate of pay was $25.00 per hour.  Chumil Aff. ¶ 11.  He worked 2.5 hours of overtime for 21 weeks of his employment and 9 hours of overtime for two weeks (52.5+18 = 70.5 total overtime hours).  *See* Chumil Aff. ¶¶ 8, 9, 10.  He should have been compensated at a rate of $37.50 for his overtime hours but instead received his regular rate of pay.  *See* Chumil Aff. ¶¶ 12, 13.  As such ($37.50-$25.00 = $12.50, and $12.50x70.5 = $881.25), Chumil is entitled to $881.25 in overtime damages [ECF No. 84-23].

In addition, Chumil was not paid anything for the final three weeks of his employment. Chumil Aff. ¶ 14.  As a result, Chumil is entitled to $3,187.50 in unpaid regular wages [ECF No. 84-23].

Chumil is entitled to a total of $4,068.75 in unpaid wages.

### xvii.    Donastorg

Donastorg's regular rate of pay was $25.00 per hour.  Donastorg Aff. ¶ 9.  For the two weeks he was employed, he worked 2.5 hours of overtime each week.  Donastorg Aff. ¶ 8.  He was never paid.  *See* Donastorg Aff. ¶ 10.  As such ($25.00x40x2 = $2,000.00, and $37.50x2.5x2 = $187.50), Donastorg is entitled to $2,000.00 in unpaid regular wages and $187.50 in overtime

damages [ECF No. 84-24].

Donastorg is entitled to a total of $2,187.50 in unpaid wages.

### xviii.    Rijo

Rijo's regular rate of pay was $25.00 per hour.  Rijo Aff. ¶ 9.  He worked 2.5 hours of overtime each week for 12 weeks (30 total overtime hours).  *See* Rijo Aff. ¶¶ 6, 8.  He should have been compensated at a rate of $37.50 for his overtime hours but received only his regular rate of pay.  *See* Rijo Aff. ¶¶ 10, 11.  As such ($37.50-$25.00 = $12.50, and $12.50x30 = $375.00), Rijo is entitled to $375.00 in overtime damages [ECF No. 84-35].

In addition, Rijo was not paid anything for the final three weeks of his employment.  Rijo Aff. ¶ 12.  Thus, Rijo is owed $3,187.50 in unpaid regular wages [ECF No. 84-35].

Rijo is entitled to a total of $3,562.50 in unpaid wages.

### 2.  Liquidated Damages, Pre-Judgment Interest, and Post-Judgment Interest

Under the NYLL, liquidated damages are presumed unless the employer proves good faith. *See* N.Y. Lab. Law § 198(1-a); *Gamero*, 272 F. Supp. 3d at 502–503; *Inclan v. New York Hosp. Grp., Inc.*, 95 F. Supp. 3d 490, 505 (S.D.N.Y. 2015).  The liquidated damages statute provides for "one hundred percent of the total amount of wages found to be due."  N.Y. Lab. Law § 198(1-a). Obviously, since Defendants have not offered any proof in this case, they do not carry their burden to prove good faith.  *See Inclan*, 95 F. Supp. 3d at 505.  Thus, each plaintiff is entitled to recover an additional 100% of his unpaid wages in liquidated damages under the NYLL.

Moreover, the Second Circuit has held that Plaintiffs may recover both liquidated damages pursuant to the NYLL and pre-judgment interest.  *See Reilly v. Natwest Markets Grp. Inc.*, 181 F.3d 253, 265 (2d Cir. 1999).  Under New York law, a prevailing employee is entitled to pre-judgment interest at a rate of 9% per year for a NYLL claim.  *See* N.Y. C.P.L.R. §§ 5001, 5004.

Where, as here, damages in the form of unpaid wages were incurred at various times, the Court "wide discretion in determining a reasonable date from which to award pre-judgment interest." *Conway v. Icahn & Co.*, 16 F.3d 504, 512 (2d Cir. 1994). In this case, the Court concludes that September 20, 2020 represents a "single reasonable intermediate date," since all or virtually all of the plaintiffs were employed and incurring damages at that point. *Maldonado v. La Nueva Rampa, Inc.*, No. 10-cv-8195 (LLS) (JLC), 2012 WL 1669341, at *11 (S.D.N.Y. May 14, 2012) (quoting N.Y. C.P.L.R. § 5001(b)).

Plaintiffs will also be entitled to recover post-judgment interest at the statutorily prescribed federal rate. *See* 28 U.S.C. § 1961(a)-(b).

### 3. Wage Notices and Wage Statements

Each plaintiff attests that he was not given a wage notice and wage statement, as required by the NYLL. *See supra* at 15–32. The Court, however, cannot award Plaintiffs damages for these recordkeeping violations consistent with the requirements of Article III jurisdiction. In the wake of the Supreme Court's discussion of standing to assert statutory violations in *TransUnion LLC v. Ramirez*, -- U.S. ---, 141 S. Ct. 2190, 2205 (2021), courts throughout the Second Circuit have come to a consensus, correctly, that plaintiffs lack standing to assert such violations under NYLL because they fail to allege "any concrete, downstream consequence of the recordkeeping violation," *Chen v. Lilis 200 W. 57th Corp.*, 19-cv-7654, 2023 WL 2388728, at *8 (S.D.N.Y. Mar. 7, 2023) (collecting cases). That is the case here, too. *See Ramirez*, 2023 WL 3570639, at *8; *Neor v. Acacia Network, Inc.*, 2023 WL 1797267, at *4 (S.D.N.Y. 2023); *Pastrana v. Mr. Taco LLC*, 2022 WL 16857111, at *7 (S.D.N.Y. Sept. 23, 2022) (concluding that plaintiffs were required to demonstrate how the "lack of notice resulted in an injury greater than" overtime violations), *report and recommendation adopted*, 2022 WL 16857107 (S.D.N.Y. Nov. 10, 2022).

Plaintiffs' lack of standing to assert the claims deprives the Court of subject matter jurisdiction over them. *See Cortlandt St. Recovery Corp. v. Hellas Telecommunications, S.a.r.l*, 790 F.3d 411, 417 (2d Cir. 2015). As such, the Court must raise the issue, *sua sponte*, at this late stage, and dismiss Plaintiffs' wage notice and wage statements claims, rather than purport to award damages when the Court lacks jurisdiction to do so. *See Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005).

## IV.    CONCLUSION

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that the Clerk of Court shall enter judgments in favor of Plaintiffs as prescribed above for unpaid wages, liquidated damages, pre-judgment interest, and post-judgment interest. Accordingly:

- Garrido is entitled to $14,230.00 in unpaid wages, $14,230.00 liquidated damages, pre-judgment interest from September 20, 2020, and post-judgment interest;

- Alcoser is entitled to $6,304.00 in unpaid wages, $6,304.00 in liquidated damages, pre-judgment interest from September 20, 2020, and post-judgment interest;

- Naula is entitled to $6,035.00 in unpaid wages, $6,035.00 in liquidated damages, pre-judgment interest from September 20, 2020, and post-judgment interest;

- Marquez is entitled to $5,493.13 in unpaid wages, $5,493.13 in liquidated damages, pre-judgment interest from September 20, 2020, and post-judgment interest;

- Mura is entitled to $5,231.25 in unpaid wages, $5,231.25 in liquidated damages, pre-judgment interest from September 20, 2020, and post-judgment interest;

- Pachar is entitled to $6,689.375 in unpaid wages, $6,689.375 in liquidated damages, pre-judgment interest from September 20, 2020, and post-judgment interest;

- Sisalima is entitled to $9,549.375 in unpaid wages, $9,549.375 in liquidated damages, pre-judgment interest from September 20, 2020, and post-judgment interest;

- Carillo is entitled to $12,836.25 in unpaid wages, $12,836.25 in liquidated damages, pre-judgment interest from September 20, 2020, and post-judgment interest;

- Garcia is entitled to $6,713.60 in unpaid wages, $6,713.60 in liquidated damages, pre-judgment interest from September 20, 2020, and post-judgment interest;

- Lima is entitled to $4,393.75 in unpaid wages, $4,393.75 in liquidated damages, pre-judgment interest from September 20, 2020, and post-judgment interest;

- Salto is entitled to $3,595.53 in unpaid wages, $3,595.53 in liquidated damages, pre-judgment interest from September 20, 2020, and post-judgment interest;

- Melgar is entitled to $8,462.50 in unpaid wages, $8,462.50 in liquidated damages, pre-judgment interest from September 20, 2020, and post-judgment interest;

- Jiminez is entitled to $10,700.00 in unpaid wages, $10,700.00 in liquidated damages, pre-judgment interest from September 20, 2020, and post-judgment interest;

- Lazcano is entitled to $3,450.00 in unpaid wages, $3,450.00 in liquidated damages, pre-judgment interest from September 20, 2020, and post-judgment interest;

- Benabides is entitled to $2,805 in unpaid wages, $2,805 in liquidated damages, pre-judgment interest from September 20, 2020, and post-judgment interest;

- Chumil is entitled to $4,068.75 in unpaid wages, $4,068.75 in liquidated damages, pre-judgment interest from September 20, 2020, and post-judgment interest;

- Donastorg is entitled to $2,187.50 in unpaid wages, $2,187.50 in liquidated damages, pre-judgment interest from September 20, 2020, and post-judgment interest; and

- Rijo is entitled to $3,562.50 in unpaid wages, $3,562.50 in liquidated damages, pre-judgment interest from September 20, 2020, and post-judgment interest.

IT IS FURTHER ORDERED that Plaintiffs shall file a motion for attorney's fees and costs by September 9, 2024.

**SO ORDERED.**

Date:  **August 28, 2024**
       **New York, NY**

**MARY KAY VYSKOCIL**
**United States District Judge**